Cooper, Appellant, *v.* Roberts.
Cooper, Appellant, *v.* Cohen.

Argued June 14, 1971. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING and CERCONE, JJ.

*Milton S. Lazaroff,* with him *Martin Techner, A. Jay Molluso,* and *Techner, Rubin & Shapiro,* for appellant.

*Francis E. Shields,* with him *Patrick J. O'Connor,* and *Pepper, Hamilton & Scheetz,* for appellees.

OPINION BY SPAULDING, J., December 13, 1971:

This is an appeal by appellant, Irene Cooper, from the denial of her motion for a new trial. The action involved a medical malpractice claim wherein appellant sought damages for the perforation of her stomach in the performance of a gastroscopic examination. Appellant sued both her general attending physician and the physician who performed the examination on February 22, 1962. Trial of appellees, Doctors Brooke Roberts and Norman Nathan Cohen before Judge CAVANAUGH and a jury in the Court of Common Pleas of Philadelphia, resulted in a verdict on May 1, 1969 for appellees and against appellant. Appellant filed a motion for a new trial which was denied by three judges of the court below, sitting en banc. This appeal is from denial of that motion.

Appellant, a 60 year old schoolteacher, upon advice of a staff physician at the University of Pennsylvania Hospital, Philadelphia, that x-rays indicated a suspicious growth within her hernia, agreed to undergo tests and studies of the condition, despite her knowledge of the existence of a hiatal hernia in her body for approximately twenty years. Upon admission to the hospital, she signed a "blanket consent form",[1] authorizing such medical procedures as her attending physician found necessary and advisable. She was placed under the care of co-appellee Roberts.

---

[1] The consent form signed by appellant on February 19, 1962, read as follows:

"Hospital of The University of Pennsylvania

"I hereby grant permission for such operative or non-operative procedures as may be deemed necessary or advisable for diagnosis and treatment by the physicians in charge of:" (Appellant's name inserted).

Additional x-rays were taken of appellant, and upon the basis of these x-rays, appellees and the hospital radiologist concurred that a gastroscopic examination was warranted to investigate a "filling defect" within appellant's hernia. Appellee Cohen agreed to perform the examination and proceeded to make the necessary arrangements. Both appellees described the nature of the examination to appellant. However, there is no indication that she was ever informed of any collateral risks, of perforation or otherwise. On one occasion, she was assured that "the examination was a relatively simple diagnostic procedure and that (there) should not be any trouble with it." Appellant agreed to undergo the examination.

The device used for the gastroscopic examination of appellant was a fiberscope, a fiberglass instrument, about $\frac{1}{4}''$ in diameter containing some 150,000 glass fibers. The fiberscope could be lowered into the stomach of a patient to photograph that area for purposes of diagnosis and treatment. The device had been in use for approximately five years at the time of appellant's examination; during that time, there had been no reported punctures, and appellee Cohen had utilized the device in 250 examinations without mishap. The fiberscope was considered an improvement over its forerunner, the semi-rigid scope, in terms of comfort for the patient, visibility of the area under examination, and safety. The incidence of perforation with the semi-rigid scope was approximately 1 in 2500, or .0004%.

Within five or six hours after the completion of the examination, appellant began evidencing distress. Upon investigation, it was found that her stomach had been punctured, requiring emergency surgery to seal the perforation.

There was no dispute among the parties that the cause of the perforation was in fact the gastroscopic

examination. Nor did appellant challenge appellee Cohen's performance of the examination as less than medically sound and proficient. Rather, appellant's action was based on assertions that the appellees had failed to apprise her of the collateral risks involved in the examination and the available medical alternatives.

Appellant cites four specific points of error:

1. The testimony of Dr. Roberts regarding the incidence of electrocution in the performance of an electrocardiogram was misleading and inaccurate;

2. Slides offered by the defendants to illustrate the character and use of the fiberscope were irrelevant and highly inflammatory;

3. The trial judge erred in his instructions to the jury that they must find for the defendants if they believed that the plaintiff would have consented to the examination notwithstanding advice of collateral risks; and

4. The trial judge erred when he charged the jury that the standard against which the defendants' conduct must be weighed is that amount of disclosure which would be made by a reasonable practitioner in the medical community.

We need deal with only the last of appellant's contentions.

In regard to the physicians' duty to disclose collateral risks, the trial judge charged the jury in the following manner: "The question is not what, regarding the risk involved, you as a member of the jury would relate to the patient under the same or similar circumstances, or what a reasonable man would relate, such as members of the jury, but what a reasonable medical practitioner would do." The judge's formulation reflects the rule followed by most jurisdictions, which require that a plaintiff show by expert testimony that in failing to disclose the risk that caused

the injury, the physician failed to conform to that standard of disclosure exercised by a reasonable practitioner within his community. *Di Filippo v. Preston,* 53 Del. 539, 173 A. 2d 333 (1961) ; *Natanson v. Kline,* 186 Kan. 393, 350 P. 2d 1093, decision explained 187 Kan. 186, 354 P. 2d 670 (1960) ; *Wilson v. Scott,* 412 S.W. 2d 299 (Texas, 1967). Such a formulation fails to produce equitable results and demeans the concept of physical integrity of the individual, to which our Supreme Court's recent decision in *Gray v. Grunnagle,* 423 Pa. 144, 223 A. 2d 663 (1966), gave substance.

The law in this Commonwealth is that where a patient is mentally and physically able to consult about his condition, in the absence of an emergency, his "informed consent" (as now defined by *Gray*), is a prerequisite to a surgical operation by his physician. An operation without such informed consent is a technical assault, making the physician liable for any injuries resulting from the invasion, regardless of whether the treatment was negligently administered.[2] *Smith v. Yohe,* 412 Pa. 94, 194 A. 2d 167 (1963) ; *Moscicki v. Shor,* 107 Pa. Superior Ct. 192, 163 A. 341 (1932). In *Gray,* supra, the Supreme Court said that in order for the patient's consent to be effective, he must have been advised of the possible consequences and risks inherent in the particular operation (at p. 166). The Third Circuit Court of Appeals in *Dunham v. Wright,* 423 F. 2d 940 (1970), relying upon *Gray,* found that a charge which instructed the jury that in order for there to

---

[2] There was some dispute as to whether the gastroscopic examination qualified as a surgical operation. Appellant was anesthetized and transported to a special area for the examination, occurrences which seem to closely relate the examination to the normal surgical procedure. However, if there is any distinction between the two types of procedures, such a distinction is immaterial for purposes of this issue. The same duty of disclosure obtains whether or not the treatment can be technically termed operative.

have been an "informed and knowledgeable" consent, the physician should have advised the patient of the consequences of the operation as well as the alternative possibilities accurately reflected Pennsylvania law and was fair to the plaintiff (at p. 946).

*Gray* and *Dunham,* make it clear that the primary interest of Pennsylvania jurisprudence in regard to informed consent is that of having the patient informed of all the material facts from which he can make an intelligent choice as to his course of treatment, regardless of whether he in fact chooses rationally.[3] Although we have high regard for the professionalism of the medical community, the standard of disclosure exercised therein bears no inherent relationship to the amount of knowledge that any particular patient might require in order to make an informed choice. Although the Court offered no specific guidelines for an alternative standard, we take cognizance of the California Court of Appeals' opinion in *Berkey v. Anderson,* 82 Cal. Rptr. 67, 1 Cal. App. 3rd 790 (1970) which unequivocally rejected the "community standard" doctrine in cases of informed consent. The Court stated at p. 78: "We cannot agree that the matter of informed consent must be determined on the basis of medical testimony any more than that expert testimony of the standard practice is determinative in any other case

---

[3] In its analysis of the holding and implications of *Gray,* supra, the Third Circuit in *Dunham,* supra, stated: "Some jurisdictions considering the duty of a physician to disclose to a patient the hazards of surgery have given the physician broad discretion by saying that a physician does not have to alarm a patient by explaining all such possibilities. Grunnagle (Gray v. Grunnagle), however, makes it clear that in Pennsylvania a consent is 'informed' only if the patient knows what is apt to happen to him and the possible adverse results and dangers of the operation. The logical inference from this formulation may be that it is not the prerogative of the physician to keep secret and screen out any of the possible complications of surgery."

involving a fiduciary relationship. We agree with appellant that a physician's duty to disclose is not governed by the standard practice in the physician's community, but is a duty imposed by the law which governs his conduct in the same manner as others in a similar fiduciary relationship. To hold otherwise would permit the medical profession to determine its own responsibilities to the patients in a matter of considerable public interest." See also *Dow v. Kaiser Foundation*, 90 Cal. Rptr. 747, 12 Cal. App. 3rd 488 (1970). As the patient must bear the expense, pain and suffering of any injury from medical treatment, his right to know all material facts pertaining to the proposed treatment cannot be dependent upon the self-imposed standards of the medical profession.

Of necessity, any physician testifying on the issue of the duty of disclosure would be testifying to either what he would have done under similar circumstances, or what he thinks another practitioner should do under such circumstances, neither of which supplies an adequate definition of the "community standard".

Finally, as a practical matter, we must consider the plaintiff's difficulty in finding a physician who would breach the "community of silence" by testifying against the interest of one of his professional colleagues.

A more equitable formulation would be: whether the physician disclosed all those facts, risks and alternatives that a reasonable man in the situation which the physician knew or should have known to be the plaintiff's would deem significant in making a decision to undergo the recommended treatment. This gives maximum effect to the patient's right to be the arbiter of the medical treatment he will undergo without either requiring the physician to be a mindreader into the patient's most subjective thoughts or requiring that he disclose *every* risk lest he be liable for battery. The

physician is bound to disclose only those risks which a reasonable man would consider material to his decision whether or not to undergo treatment. This standard creates no unreasonable burden for the physician.

We recognize that generally, proof that a physician has breached some duty to his patient requires that the plaintiff present expert testimony of the standard in the medical community. However, there is a basic distinction between the normal malpractice suit, where the gist is whether the physician failed to conform to accepted medical practice, and "informed consent" cases, where the salient question is whether the patient made an effective assent to treatment, and where determining whether there was any dereliction of professional duty on the part of the physician is only one facet in the resolution of the ultimate issue. Our Supreme Court recognized this difference in *Gray* by treating questions of consent to medical treatment as an area basically governed by contractual concepts. The Court there cited with approval the following from Powell's "Consent to Operative Procedures", 21 Md. L. Rev. 189, 191 (1961): "In order to understand the nature of consent it is necessary at the outset to have some understanding of the legal relationship between the physician and his patient. This relationship is essentially contractual in nature . . . . In short, the surgeon must operate in accordance with the agreement made between the parties. Consent for the operation or treatment arises from the contract and is given only in connection with what the parties understood was to be done."

There is no need to extend the requirement of expert testimony into areas where no technical expertise is necessary. Determination of what a reasonable man would do or consider significant within the context of a particular set of facts is standard fare for jurors,

for which they need no expert assistance. *Reardon v. Meehan,* 424 Pa. 460, 227 A. 2d 667 (1967) ; *Steele v. Shepperd,* 411 Pa. 481, 192 A. 2d 397 (1963).

After lengthy consideration of this issue, we find this determination to be the most equitable balance between the patient's right to control what happens to his body, and the interest of fostering the practice of responsive, progressive medicine.

The order of the court below is reversed, and a new trial is granted.

JACOBS, J., dissents.