363 A.2d 1167

Lucian JEFFRIES and Virginia M. Jeffries, his wife

v.

N. J. McCAGUE, M.D., Appellant, and C. C. Altman, M.D., Individually and trading and doing business as Altman and McCague.

Superior Court of Pennsylvania.

Argued April 16, 1976.

Decided Sept. 27, 1976.

John W. Jordan, IV, Pittsburgh, for appellant.

John A. DeMay, Pittsburgh, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

HOFFMAN, Judge:

Plaintiff-appellee filed an action in trespass against defendant-appellant, a urologist, for failure to obtain appellee's informed consent before he performed a prostatectomy on appellee. Based on the pleadings, appellant's deposition, and appellee's affidavit, the lower court granted appellee's motion for a summary judgment. We agree with appellant's contention that the summary judgment was improperly granted and, therefore, we reverse.

On August 22, 1973, appellee consulted appellant when appellee experienced acute urinary retention. Appellant relieved appellee's condition by use of a catheter and advised appellee that surgery would be necessary. Appellee

was admitted on the same day to Mercy Hospital in Pittsburgh. Appellant, chief of the Division of Urology in Mercy Hospital, diagnosed the condition as benign prostatic hypertrophy. On August 29, 1973, he performed a retropubic prostatectomy. Appellee was discharged from the hospital on September 16, 1973.

On April 10, 1975, appellee filed a complaint in trespass in which he alleged that as a result of the operation, he had become incontinent and impotent. Further, he alleged that:

"5. . . . on August 29, 1973, a retropubic prostatectomy was performed by [appellant].

"6. On the same date due to extensive bleeding, the Defendant, C. C. Altman, M. D.[1], returned the Plaintiff to the Operating Room for a cystoscopic evacuation of blood clots and the insertion of a Foley catheter to which was attached a hemostatic bag.

"7. The Defendants [Dr. Altman and appellant] were negligent in the manner in which they performed this operation . . . and the manner in which they treated Plaintiff in the following respects:

"A. The Defendants failed to obtain the informed consent of Husband-Plaintiff to the operation:

"(1) Defendants failed to inform the Plaintiffs[2] of the four recommended operative techniques that were available to them for the treatment of his condition;

"(2) The Defendants failed to inform the Plaintiffs of the advantages and drawbacks of the four accepted operative techniques;

1. According to the complaint, Dr. Altman and appellant were partners.

2. The complaint alleges that appellant failed to inform the appellee and appellee's wife of the various risks involved. The majority of jurisdictions that have considered the question have held that the duty extends only to the patient, if competent, but not to the patient's family. See, Zaslow, Informed Consent in Medical Practice, 22 Practical Lawyer 13 (1976).

"(3) The Defendants failed to inform the Plaintiffs of the relative advantages, risks, and hazards involved in the performance of a retropubic prostatectomy;

"(4) Defendants failed to advise the Plaintiffs of alternatives that were available to them;

"(5) The Defendants failed to advise the Plaintiffs of the probabilities and possibilities of incontinence resulting from this operation;

"(6) Defendants failed to inform the Plaintiffs of the probabilities and possibilities of impotence resulting from this operation; and

"(7) The Defendants failed to spend any reasonable time with the Plaintiffs discussing his condition, the nature of the procedure, and the possible sequelae of the procedure."

On May 8, 1975, appellee took appellant's deposition and on July 7, 1975, filed a motion for summary judgment. Appellee's motion stated that "[t]he Deposition of [appellant] has been taken which clearly establishes that he failed to secure the 'Informed Consent' of the Plaintiffs to this operation." Relevant portions of the deposition were attached to appellee's motion. The appellant testified in part as follows:

"Q. [by appellee's counsel]. Doctor, before performing this operation did you have a discussion with [appellee] concerning the operation?

"A. Yes.

"Q. When did this discussion take place? . . .

"A. It took place specifically the day before . . . .

"Q. Is it your recollection that it was while making rounds that you discussed this operation with [appellee]?

"A. It is not a recollection.

"Q. What is it?

"A. It is simply my routine that I perform.

"Q. Do you have an [sic] clearcut and definite recollection of having discussed this operation with [appellee]?

"A. No, sir . . . .

"Q. . . . Doctor, do you recall specifically having advised [appellee] of the several types of prostatectomies that can be performed?

"A. Do I have a specific recollection?

"Q. Yes.

"A. No.

"Q. Do you have a specific recollection of advising [appellee] that you were going to perform a retropubic prostatectomy?

"A. No.

"Q. Do you have a specific recollection of advising him why you were utilizing this type of procedure?

"A. No.

"Q. Do you have a specific recollection of advising him of any risks, hazards or dangers of this procedure?

"A. No. . . .

"Q. Do you have a specific recollection of advising [appellee] of the possibilities of incontinence resulting from this operation?

"A. No.

"Q. Do you have a specific recollection of advising [appellee] of the possibility of impotence resulting from this operation?

"A. No.

"Q. Is impotence a possible result of this operation?

"A. No.

"Q. Is incontinence a possible result of this operation?

"A. Yes.

"Q. All right. Now, Doctor, let me ask you just a little bit and perhaps much the same questions as regards

your general procedure with your patients . . . .
Do you ordinarily sit down and discuss with your patients
the nature of the operation you are going to do?

"A. Yes . . . . I have a specific plan that if
there is any question of prostatic surgery, I will explain
this to the patient as an outpatient the very first time I
come to the conclusion that it is a possibility. Then when
I know things I need to know about the man, I will dis-
cuss it with him the day before his surgery or the day
that I know the specific method that I am going to use
. . . .

"Q. All right. Doctor, tell me what you tell a patient
upon whom you are going to perform a retropubic prosta-
tectomy.

"A. I tell him that he will have an incision in his ab-
domen, that the enlargement of his prostate will be re-
moved without entering his bladder, that he will wear a
catheter through his urethra for a period of five to seven
days, and that he will have a small rubber drain in his in-
cision. He will have bottles of water irrigating his blad-
der for the first 24 to 48 hours, but he will be out of bed
the day of operation in most instances . . . .

"Q. Do you habitually advise your patients upon
whom you are going to do a retropubic prostatectomy,
and more particularly your male patients, of the alterna-
tive types of procedures that you could utilize?

"A. Yes.

"Q. Tell me about it.

"A. I tell them this when I explain the procedures
that I'm going to do, because I contrast it and compare it
with others.

". . . [B]efore we ever get to discussing the re-
tropubic prostatectomy, the patient is aware of the dif-
ferent approaches.

"Q. Where does he learn this?

"A. He learns it from me.

"Q. When?

"A. Usually as an outpatient.

"Q. Then what do you tell him as an outpatient?

"A. I tell him that there are three common methods that we use in prostatic surgery: that we use superpubic, retropubic and trans-urethral. We like to do trans-ure-thral if it is possible because we think it is a simpler operation for the patient to get over, and we hope that he can have a trans-urethral. I explain that the trans-urethral is removal of the adenoma piece by piece, without making an incision; that he will wear a catheter from three to five days following this, if this is done.

"I explain to him that the superpubic prostatectomy is, as far as he is concerned, indistinguishable from the retropubic prostatectomy, except that he will have more pain if the superpubic prostatectomy is done, and it will always be done in case he needs vesical drainage in addition to his prostatectomy.

"Q. Do you go on and explain the retropubic prostatectomy?

"A. No, not until I decide which one he is going to have, and then I tell him in detail . . . .

"Q. I ask you again, search your memory. Is there anything more that you routinely tell people in the position of [appellee] who are about to be operated on the next day, or people like [appellee] whom you are sending to the hospital for an eventual operation?

"A. I can't think of anything else that I tell them routinely." In addition, appellee filed an affidavit in which he alleged that no one explained to him what the results of a cystoscopy might be; why the operation was necessary; what alternatives were available; what risks were associated with the operation; or what problems might result from the operation. Pursuant to Rule 1035(d), Pa. R.C.P., appellant opposed the motion for summary judg-

ment and alleged that, in fact, there were genuine issues of material fact not resolved by the pleadings and deposition.

On October 9, 1975, the lower court granted appellee's motion for summary judgment as to appellant's liability. In its opinion, after citing extensively from appellant's deposition, the lower court concluded that "[i]t is very clear that the [appellant] did not disclose any of the information to [appellee] as was his duty under our law. Of this, there can be no dispute."

The propriety of the lower court's grant of appellee's motion for summary judgment must be assessed in light of the well-established rules and principles governing such motions. "It is well established that we can sustain a summary judgment only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Pa.R. Civ.P. 1035(b), 12 P.S. Appendix; *Michigan Bank Nat. Ass'n v. Steensen*, 211 Pa.Super. 405, 236 A.2d 565 (1967). The record must be examined in the light most favorable to the nonmoving party. *Schacter v. Albert*, 212 Pa.Super. 58, 239 A.2d 841 (1968). . . . Finally, a summary judgment should be granted only when the case is clear and free from doubt. *Mallesky v. Stevens*, 427 Pa. 352, 235 A.2d 154 (1967)." *Toth v. Philadelphia*, 213 Pa.Super. 282, 285, 247 A.2d 629, 631 (1938). Further, ". . . all doubts as to the existence of a genuine issue as to a material fact must be resolved against the party moving for summary judgment." *Ritmanich v. Jonnel Enterprises, Inc.*, 219 Pa.Super. 198, 203, 280 A. 2d 570, 573 (1971).

The principle of informed consent was adopted by our Supreme Court in *Gray v. Grunnagle*, 423 Pa. 144, 223 A. 2d 663 (1966). In *Gray*, the appellant had signed a blanket consent form which stated that ". . . I . . .

have been informed by the physicians of said hospital that in their opinion an operation on me is necessary for the proper treatment of my illness. I hereby consent to the same and said physicians are hereby authorized to employ whatever operative procedure they deem necessary, using their best skill and judgment." 423 Pa. at 147–48, 223 A.2d at 665. *Gray* established "a broad but workable rule:

"(1) where a physician or surgeon can ascertain in advance of an operation alternative situations and no immediate emergency exists, a patient should be told of the alternative possibilities and given a chance to decide what should be done before the doctor proceeds with the operation;

"(2) the doctor is under a duty to advise the patient adequately on the dangers to be anticipated as a result of the operation and not to minimize them;

"(3) the plaintiff has the burden to prove the operation performed had not been authorized." *Bowers v. Garfield*, 382 F.Supp. 503, 505 (E.D.Pa.1974) aff'd without opinion, 503 F.2d 1398 (3rd Cir. 1974).

Although *Gray* states the principle that a physician must apprise a patient of possible results of a surgical procedure, this duty has not been construed to mean that the physician must disclose every conceivable result, no matter how remote. Rather, "[t]he physician is bound to disclose only those risks which a reasonable man would consider material to his decision whether or not to undergo treatment." *Cooper v. Roberts*, 220 Pa. Super. 260, 268, 286 A.2d 647, 650–651 (1971). Pennsylvania law does not leave that judgment to expert medical decision; instead, *Cooper v. Roberts* makes clear that the issue is for the jury. See also, Proposed Pennsylvania Standard Jury Instructions, Civil, 10.07 Informed Consent. The rule that the issue is to be decided by the jury, not on a medical standard, but on a reasonable man stand-

ard reflects concern for two problems: on the one hand, the rule preserves the patient's dignity in choosing his own course; on the other hand, by requiring only that information that would be relevant to a reasonable man, a doctor is not required to give every patient a complete course in anatomy and to explain every risk, no matter how remote, before a consent would be valid.[3]

In the instant case, the appellee relies in large part on the fact that appellant conceded in deposition that incontinence was a possible consequence of a prostatectomy. After quoting from appellant's deposition, appellee states in his brief: "Note that there is not one word mentioned about any ill effects, risks, or hazards relating to surgery. This, despite the Doctor's admission that he knows that incontinence is a possible result of this surgery."

Based on appellee's motion for summary judgment, we know that appellant performed surgery on appellee, that since that time appellee has been incontinent, that appellee was not warned that incontinence was a risk of the surgery and that appellant admits that incontinence was a possible consequence. We do not know the severity of appellee's illness. Nor do we know whether the conceded "possibility" was a substantial risk.

**3.** For an analysis of the doctors' problems under Pennsylvania standards, see Dr. Zaslow's article, supra, n. 2, at 17:

"The physician's problem is the concept of the reasonable man, which is a legal term of art, at best indefinite and imprecise, that offers no satisfactory guidelines to which a physician may refer. A physician will understand that a patient should be informed of all those complications that are apparent and obvious, such as a change or loss of voice following a thyroidectomy, a facial palsy as a result of facial nerve injury during or following a parotidectomy, or a paralysis of an extremity, even though these occur in only a very small percent of cases operated. On the other hand, should he discuss wound infections, pulmonary complications, wound disruptions, adjacent organ injuries such as fistulas, failure of an intestinal anastomosis to heal with resulting peritonitis, and many more? In addition there are actually many complications that may occur which are so unusual that even the most learned physician cannot think of them all."

We must keep in mind that the rules governing summary judgment require that we examine the record in the light most favorable to appellant, the nonmoving party in this case. For the summary judgment to be proper, there can be no fact left for the jury to resolve. Our review of the record indicates several issues that are properly decided by the jury under *Cooper v. Roberts,* supra. At trial, the jury must consider the severity of acute urinary retention. After hearing evidence concerning whether incontinence was a meaningful or only a slight possibility of the procedure used by appellant, the jury must decide whether, in the light of the severity of appellee's condition, a reasonable man would have considered the possibility of incontinence material to his decision to undergo treatment.

The lower court determined that appellant had not told appellee that incontinence was a possible result of the operation; in the court's view, that was sufficient to grant summary judgment. As discussed, however, that is not dispositive of the case. Notwithstanding the appellant's inability to recall specifically his conversation with appellee, appellant testified extensively in his deposition concerning his normal procedure prior to the operation. Thus, at trial, the jury must consider whether the appellant, in fact, gave appellee his "routine" explanation of the operative procedures. If the jury finds that appellant did so, it must then decide whether, under all the circumstances, such a description was adequate to inform a reasonable man, and to render his consent valid.

Therefore, we reverse and remand for further proceedings.