390 A.2d 259

Gordon R. SAURO, Administrator of the Estate of Beverly Sauro, Deceased, Appellant,

v.

Charles R. SHEA, Donald R. Wolford, Robert S. DeWaters, Jr., Irving S. Leuin and Valley Oral Surgeons, LTD., a professional corporation.

Superior Court of Pennsylvania.

Argued April 10, 1978.

Decided July 12, 1978.

Richard J. Catalano, Pittsburgh, for appellant.

James Francis O'Malley, Johnstown, with him Yost & O'Malley, Johnstown, for appellees.

Before JACOBS, President Judge, and HOFFMAN, CER-CONE, PRICE, VAN der VOORT and SPAETH, JJ.

HOFFMAN, Judge:

Appellant contends that the lower court erred in (1) refusing to charge the jury on the issue of informed consent, (2) admitting into evidence certain written statements of appellees, (3) admitting into evidence the curriculum vitae of appellees' expert witness, and (4) refusing to grant a new trial or judgment n. o. v. because the jury verdict was against the weight of the evidence. We agree that the lower court erred in refusing to charge the jury on the issue of informed consent and, therefore, we reverse and remand.

At a jury trial in the Cambria County Court of Common Pleas which began on May 10, 1976, and ended on May 19, 1976, the following facts were adduced: On September 1, 1971, at approximately 9:00 a. m., appellant's decedent, Beverly Sauro, age 23, went to the offices of Valley Oral Surgeons, Ltd., to undergo extraction of her remaining 23 teeth. Prior to the surgical procedure, the decedent completed a brief, written medical screening form in which she answered questions regarding her medical history. At that time, the decedent also signed the following form:

"I hereby authorize the operation, and acknowledge that the nature of such operation or procedure, its seriousness and possible outcome have been explained to me and that I have understood the explanation. I also acknowledge that no guarantee has been given to me by anyone concerning the results which may be obtained.

"I understand that in consenting to the performance of this operation or procedure, I am authorizing as well, all procedures which are ordinarily incident to the procedure named or described, including the administration of such anesthetics as may be considered advisable.

"I have completed the medical screening form." Dr. Shea, an appellee, then briefly examined the decedent by checking her pulse and blood pressure.

Prior to surgery, appellee, Dr. DeWaters, another appellee and the operating surgeon, verbally reviewed the medical screening form with the decedent. No one discussed with the decedent either the possible risks of the surgical procedure or the comparative risks of general and local anesthesia. At approximately 9:30 a. m., Dr. DeWaters intravenously administered general anesthesia to the decedent in the form of 25 mg of Demerol, 1/150 of Atropine, and 15 CC of a 1% solution of Brevital. Dr. DeWaters then administered 25% oxygen and 75% nitrous oxide and penthrane through an inhalation mask. Dr. DeWaters alone administered the anesthesia, performed the surgery, and monitored the decedent's life signs. Two assistants aided him; neither assistant was a certified dental technician or had any formal surgical, dental, or anesthesiology training. The surgical procedure lasted approximately 30 minutes. At about 10:05 a. m., during the recovery phase following the completion of surgery, the assistant who was holding an oxygen mask over the decedent's face informed Dr. DeWaters that the patient was beginning to "look dark". At that point, Dr. DeWaters, who was at the sink washing up, went to the decedent and observed that she was cyanotic and in a state of cardio-respiratory arrest. He observed that the decedent was not breathing, had no pulse, and that she had fixed and dilated

pupils. Dr. DeWaters called for appellees Drs. Shea and Wolford who were in adjacent rooms. They assisted Dr. DeWaters in attempting to resuscitate the decedent through the use of cardiac chest massage and the injection of drugs. After about five minutes, the decedent, although still unconscious, appeared to be responding slightly. However, at 10:20, as she was being placed into a previously summoned ambulance, decedent again became cyanotic and suffered cardio-respiratory arrest. When the decedent arrived at the emergency room of the Conemaugh Valley Memorial Hospital at about 10:30, the hospital staff continued resuscitation efforts. The decedent remained in the hospital until September 4, 1971, during which time she never regained consciousness and was sustained by an artificial life support system. On September 4, 1971, decedent was officially pronounced dead. The death certificate stated that the cause of death was irreparable brain damage resulting from cerebral anoxia caused by cardio-respiratory arrest.[1]

Appellant, the decedent's father and administrator of her estate, filed a complaint in trespass on August 31, 1972. Following trial and a jury verdict for appellees, appellant moved for a new trial and judgment n. o. v. This appeal followed the lower court's denial of appellant's motion.

Appellant contends that the lower court erred in refusing to charge the jury on the issue of informed consent. At trial, appellant requested the following instruction:

"The law in this Commonwealth is that where a patient is mentally and physically able to consult about his condition, in the absence of an emergency, his 'informed consent' is a prerequisite to a surgical operation by his physician. An operation without such informed consent is a technical assault, making the physician liable for any injuries resulting from the invasion regardless of whether the treatment was negligently administered." Prior to delivering instructions to the jury, the court ruled that because the decedent signed a consent form, there was insufficient evidence, as a matter

1. The precise cause of decedent's death is unknown. Her parents refused to consent to an autopsy.

of law, for the jury to consider the issue of informed consent. We disagree.

■ Our Supreme Court stated the doctrine of informed consent in *Gray v. Grunnagle*, 423 Pa. 144, 155, 223 A.2d 663, 668 (1966) as follows:

" 'The principles of law applicable to this phase of the litigation are clear. Such principles are: (a) where a patient is mentally and physically able to consult about his condition, in the absence of an emergency, the consent of the patient is " 'a prerequisite to a surgical operation by his physician' " and an operation without the patient's consent is a technical assault (*Moscicki v. Shor*, 107 Pa.Super. 192, 195, 163 A. 341; *Dicenzo v. Berg*, 340 Pa. 305, 307, 16 A.2d 15); (b) the burden is on plaintiff to prove "that the operation performed, or substantially that operation, was not authorized by him": *Dicenzo v. Berg*, supra, 340 Pa. 307, 16 A.2d 16.' "

In *Dunham v. Wright*, 423 F.2d 940 (3d Cir. 1970), the Third Circuit Court of Appeals analyzed the rationale underlying the doctrine of informed consent: ". . . [b]efore a patient will be deemed to give an informed consent, it may be necessary that he know the alternative methods of treatment available to him and the inherent dangers and possibilities of success of such alternatives. The philosophy behind such theory of informed consent is that the patient has the right and responsibility to determine whether he wants to risk the suggested corrective surgery. If a patient's decision is to be a knowing and intelligent one, he must understand in addition to the risks of the suggested surgery, the possible results of the failure to chance it. A complete understanding of the consequences of foregoing the operation would seem necessarily to include a consideration of the alternative treatment for the patient's disease or condition.

"Some jurisdictions considering the duty of a physician to disclose to a patient the hazards of surgery have given the physician broad discretion by saying that a physician does not have to alarm a patient by explaining all such possi-

bilities. *Grunnagle*, however, makes it clear that in Pennsylvania a consent is 'informed' only if the patient knows what is apt to happen to him and the possible adverse results and dangers of the operation. The logical inference from this formulation may be that it is not the prerogative of the physician to keep secret and screen out any of the possible complications of surgery.

> . . . . .

"[In *Grunnagle*] [t]he Pennsylvania Supreme Court indicated that a patient can make a decision only if he is told all of the consequences . . . [T]he Court stated:

' " * * * [I]t will be no defense for a surgeon to prove that the patient had given his consent, if the consent was not given with a true understanding of the nature of the operation to be performed, the seriousness of it, and organs of the body involved, the disease or incapacity sought to be cured, and the possible results." ' 423 Pa. at 166, 223 A.2d at 674." *Dunham*, supra, at 944–45.

In *Cooper v. Roberts*, 220 Pa.Super. 260, 286 A.2d 647 (1971) (allocatur refused in 221 Pa.Super. xlviii (1972), our Court articulated the standard by which to evaluate the scope of a physician's duty to disclose risks involved in a surgical procedure. In *Cooper*, supra, the plaintiff entered the hospital for tests and studies of a growth on a hiatal hernia. She signed the following consent form:

"I hereby grant permission for such operative or non-operative procedures as may be deemed necessary or advisable for diagnosis and treatment by the physicians in charge of" (Appellant's name inserted). Plaintiff subsequently underwent a gastroscopic examination. Although defendant physicians explained the nature of the procedure to plaintiff, they did not inform her of any attendant risks. Shortly after completion of the gastroscopic examination, plaintiff suffered a perforated stomach. In reversing the trial court, our Court held that a physician must disclose all material risks that are collateral to a surgical procedure. Moreover, we stated that the criterion for determining "materiality" is an objective standard:

"*Gray* and *Dunham*, make it clear that the primary interest of Pennsylvania jurisprudence in regard to informed consent is that of having the patient informed of all the material facts from which he can make an intelligent choice as to his course of treatment, regardless of whether he in fact chooses rationally. Although we have high regard for the professionalism of the medical community, the standard of disclosure exercised therein bears no inherent relationship to the amount of knowledge that any particular patient might require in order to make an informed choice.

". . . As the patient must bear the expense, pain and· suffering of any injury from medical treatment, his right to know all material facts pertaining to the proposed treatment cannot be dependent upon the self-imposed standards of the medical profession.

. . . . .

"A more equitable formulation would be: whether the physician disclosed all those facts, risks and alternatives that a reasonable man in the situation which the physician knew or should have known to be the plaintiff's would deem significant in making a decision to undergo the recommended treatment. This gives maximum effect to the patient's right to be the arbiter of the medical treatment he will undergo without either requiring the physician to be a mindreader into the patient's most subjective thoughts or requiring that he disclose *every* risk lest he be liable for battery. The physician is bound to disclose only those risks which a reasonable man would consider material to his decision whether or not to undergo treatment. This standard creates no unreasonable burden for the physician." *Cooper*, supra, 220 Pa.Super. at 266–268, 286 A.2d 647, at 650.

■ Finally, Pennsylvania case law explicitly holds that the issue of informed consent is a question for the finder of fact. In *Jeffries v. McCague*, 242 Pa.Super. 76, 363 A.2d 1167 (1976), our Court reversed a lower court's grant of summary judgment for the plaintiff and stated: " '[T]he physician is bound to disclose only those risks which a

reasonable man would consider material to his decision whether or not to undergo treatment.' *Cooper v. Roberts*, 220 Pa.Super. 260, 268, 286 A.2d 647, 650–651 (1971). Pennsylvania law does not leave that judgment to expert medical decision; instead, *Cooper v. Roberts* makes clear that the issue is for the jury." *Jeffries*, supra, 242 Pa.Super. at 84, 363 A.2d 1167, at 1171. See also *Dunham v. Wright*, supra; *Gray v. Grunnagle*. Accordingly, the jury as fact-finder must evaluate the severity of the condition resulting from surgery, whether the result was a meaningful or only slight possibility of the surgical procedure, and whether a reasonable person would have considered the possibility of the resulting condition material to the decision to undergo treatment. Moreover, the jury must consider whether the physician adequately informed the patient of the nature and possible consequences of the procedure, as well as its alternatives, and whether, under all the circumstances, the description was adequate to inform a reasonable person and render the consent valid. *Jeffries*, supra.

An analysis of the facts of the instant case demonstrates that the lower court erroneously removed the issue of informed consent from the jury's consideration. Dr. DeWaters, as both operating surgeon and the physician administering anesthesia, had the duty to inform the decedent of the material risks and consequences of the surgical and anesthetic procedures as well as to describe the comparative risks of alternatives. At trial, Dr. DeWaters testified on cross-examination as follows:

"Q. As to that local anesthetic, Doctor, had you explained the dangers and risks involved in a general anesthetic?

"A. No, that is not the time to explain that.

"Q. Did you compare the risk or exposure between a local anesthetic and a general anesthetic to her?

"A. No, I did not.

. . . . .

"Q. Just a few more questions, Doctor. Yesterday, I asked you a couple of questions about explaining risks and dangers to Beverly of a general anesthetic, and I believe you said you had not, is that correct?

"A. That is correct.

"Q. Did you explain to her the reasonable possible complications which might arise as the result of administering a general anesthetic?

"A. No, I did not.

"Q. You did not explain to her that cardiac arrest or anoxia was a possibility?

"A. No, I did not.

"Q. Doctor, you are an oral surgeon and that involves an expertise in dentistry and administering anesthesia, correct?

"A. Correct."

Moreover, both of Dr. DeWaters' assistants testified that Dr. DeWaters did not inform the decedent of the dangers involved. Ms. McGregor testified as follows:

"Q. Did Dr. DeWaters explain to her the risks of a general anesthetic before he administered it?

"A. No.

"Q. He didn't tell her of the dangers or potential dangers involved in it?

"A. No.

"Q. He did not compare those dangers with the dangers, if any, of a local anesthetic?

"A. No."

Ms. Plowchin testified as follows:

"Q. He asked her if she wanted a local anesthetic?

"A. Yes.

"Q. Did he tell her the dangers of a general anesthetic when he asked her that?

"A. No.

"Q. Did he tell her the possible risks or complications of a general anesthetic?

"A. No.

"Q. Did he compare a general anesthetic with a local anesthetic as to the risks or dangers involved?

"A. No.

"Q. You were there the whole time?

"A. Yes."

At trial, appellant's counsel explored the scope of the possible risks and complications involved in the procedures performed upon the decedent. On cross-examination, Dr. DeWaters testified as follows regarding the dangers of general anesthesia that he used:

"Q. So, really you are dealing here with a mixture of a gas which could be lethal combined with oxygen to keep the patient alive, is that correct?

"A. That is what you are dealing with in any anesthetic gas.

"Q. That was my next question, Doctor. General anesthesia drugs being used, they in and of themselves, can do harm to somebody if they are not properly administered?

"A. Yes, that is true but they are rated in regards to their potency. . . .

. . . . .

"Q. So that when a patient is given a general anesthetic they have no protective reflexes as such, is that correct?

"A. They have no protective reflexes at the state of anesthesia you attain. They do before and they do immediately after, but at the peak effect of the drug, they do not.

"Q. This type of reflexes would be the ability to cough or swallow?

"A. Or speak.

"Q. Would it be correct to characterize the condition of the patient under a general anesthetic as being helpless or dependent upon those attending to her?

"A. Yes.

"Q. For care?

98

"A. Yes."

Dr. DeWaters further testified regarding the dangers of anoxia of a patient under general anesthesia:

"Q. Now. Beverly Sauro became cyanotic after the second arrest, is that correct?

"A. Correct.

"Q. And she remained cyanotic during the time she was worked on in the Emergency Room?

"A. Yes, that is correct.

"Q. Cyanotic is that bluing or ashen turning of the skin, is that correct?

"A. Correct.

"Q. And that is a sign of improper profusion or oxygenation of the body?

"A. That is correct.

. . . . .

"Q. One other question before that, Doctor, when somebody turns cyanotic again they turn a bluish or off color?

"A. An off color.

"Q. And that is important, is it not, because it is a sign of poor oxygenation?

"A. Yes.

"Q. And that can lead to cardiac arrest?

"A. It can.

"Q. It can lead to brain damage also, if it continues, is that correct?

"A. It can.

"Q. So that the color that the patient reaches is important, the coloring of the patient is important?

"A. The coloring of the patient is always important." [2]

2. Dr. Shea, the only other appellee to testify, stated that he did not recall the decedent and only testified regarding his routine procedure in examinations.

 Dr. DeWaters' testimony established that he was aware that certain serious and potentially fatal risks and complications inhered in the use of general anesthesia, particularly in an office setting where comprehensive treatment for cardio-respiratory problems was unavailable. The record further revealed that the decedent was uninformed of the possible risks and complications of the procedure as well as possible available alternatives. Consequently, we conclude that the record presented sufficient evidence for the jury to determine whether, under all the circumstances, appellee sufficiently informed the decedent of possible material dangers, complications, and alternatives in order adequately to inform a reasonable person and to render her consent valid.[3] *Jeffries*, supra. Because the lower court erred in removing the issue of informed consent from the jury, we reverse and remand for a new trial.[4]

Reversed.

3. Appellees also maintain that decedent's consent was informed and valid because she had undergone several other general anesthetic procedures in the recent past prior to other tooth extractions at appellees' clinic. First, the fact that the decedent received similar general anesthesia in the past does not necessarily constitute valid informed consent to the procedure in question. Second, we note that the alleged similar past procedures were far more limited in scope than the instant procedure involving extraction of 23 teeth. Finally, appellees offered no testimony regarding any specific information they had given the decedent in connection with past extractions.

4. Because we reverse and remand for a new trial based on the lower court's error in refusing to charge the jury on the informed consent issue, we need not consider appellant's other contentions. However, the following comments regarding the admission into evidence of certain written statements of appellees may be instructive to the lower court at the new trial.

At trial, over appellant's objection, the lower court admitted into evidence a two page, unsigned, undated narrative statement recounting the events surrounding decedent's cardio-respiratory attack at appellees' offices. The narrative was prepared for or on behalf of appellees, but the author is unknown. Appellant objected to the narrative on the grounds that it was inadmissible hearsay. Appellees responded by characterizing the report as a medical or business record, and the lower court agreed.

The Uniform Business Records As Evidence Act, Act of May 4, 1939, P.L. 42 No. 35, § 2; 28 P.S. 91b provides as follows:

PRICE, J., concurs in the result.

VAN der VOORT, J., dissents.

"A record of an act, condition or event shall, in so far as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission."

Our courts have recognized that hospital or medical reports are admissible as business records pursuant to the Uniform Business Records Act if the report meets the following criteria: (1) The report is made contemporaneously with the events it purports to relate, (2) at the time the report was prepared, it was impossible to anticipate reasons which might arise in the future for making a false entry in the original, and (3) the person responsible for the statements contained in the report is known. *Meyers v. Genis*, 235 Pa.Super. 531, 344 A.2d 691 (1975). See also *Paxos v. Jarka Corp.*, 314 Pa. 148, 171 A. 468 (1934).

In examining the facts of the instant case, we note that the written medical report does not meet these criteria. First, the report could not have been made contemporaneously with the events that occurred in appellees' office. The report is undated. Moreover, the portions of the report which discuss the decedent's subsequent hospitalization, death, and absence of an autopsy indicate that the report could not have been composed until at least September 4, 1971, the date of decedent's death, three days after the events in appellees' offices. Secondly, because the report was made after decedent's death which followed appellees' treatment, at the time the report was prepared, it was possible to anticipate reasons which might arise in the future for making a false entry in the original, i. e., the possibility of litigation. Lastly, because the report is unsigned and refers to all appellees in the third person, it is impossible to ascertain the source or author of the report. Furthermore, appellees did not indicate the identity of the author. Consequently, it is impossible to know who was responsible for the statements contained in the report.