**Darrell C. CRAIN, et al., Appellants,**

**v.**

**Liliane ALLISON, et al., Appellees.**

**No. 81–20.**

District of Columbia Court of Appeals.

Argued Oct. 29, 1981.

Decided April 1, 1982.

---

Hugh E. Donovan, Silver Spring, Md., for appellants.

James C. McKay, Washington, D. C., with whom Jonathon R. Yarowsky, Washington, D. C., was on brief, for appellees.

Before KELLY, KERN and BELSON, Associate Judges.

KELLY, Associate Judge:

In this appeal from a judgment entered after a jury verdict in favor of Liliane and General Royal B. Allison, appellees, and against Dr. Darrell C. Crain and Arthritis Rehabilitation Center, appellants, it is alleged that the trial court erred in (1) denying appellants' motion for directed verdict on the issue of informed consent, (2) admitting a letter into evidence in violation of the hearsay rule and policies against admission of settlement negotiations, and (3) refusing to allow appellants' counsel to impeach one of appellants' own witnesses.[1] We affirm.

Dr. Crain is one of six physicians who specialize in rheumatology under the name Arthritis Rehabilitation Center. In January 1977, appellee, Liliane Allison, came under the care of appellants for the treatment of swollen and painful fingers of her right hand. In March 1977, Dr. Crain diagnosed Mrs. Allison's condition as osteoarthritis and started her on a conservative course of treatment. Next, Dr. Crain began a series of injections of Aristospan (cortisone) into the affected joints to reduce the inflammation. The right index finger was injected in the distal interphalangeal joint on four occasions and in the proximal interphalangeal joint on five occasions.[2] Dr. Crain agreed that cortisone should never be injected into a joint in the presence of infection because it may reduce the body's resistance to infection and the ability to localize the infection; before such an injection, a diagnosis must be established and specific infectious arthritis must be ruled out. Both the Aristospan package insert

---

1. We need not reach the additional issue raised by appellees.

2. Both joints were treated on April 15, 1977, October 7, 1977, March 15, 1978, and June 12, 1978. The proximal interphalangeal joint was also injected on April 29, 1977.

and the PHYSICIAN'S DESK REFERENCE warn physicians of the problems of infection associated with the use of cortisone injections. Dr. Crain testified that he was aware of the risks and that he warned Mrs. Allison of the remote possibility of infection before treating her. Dr. Crain prescribed penicillin after each injection. He testified that this procedure indicates "that the patient had been told that there could be some possibility of infection and that this was given as a prophylactic measure." However, Mrs. Allison testified that she was not warned of the risk of infection and that had she been warned, she would not have permitted the cortisone injections.

General Allison testified that on June 12, Mrs. Allison's right index finger was painful, swollen, inflamed, and appeared as if pus was under the surface of the skin. On that date, Dr. Crain opened the area around a cyst which had developed and injected cortisone into the joints without testing for infection. By June 15, the finger was "definitely worse." Dr. Crain did not believe it was infected but felt that there "was a good possibility that there was some possibility that it might" be infected. He testified that it is difficult to tell when a finger is infected or only inflamed from arthritis. Mrs. Allison was treated by Dr. Crain on July 11 and July 28, when the cyst had reappeared. Dr. Crain testified that the cyst was unrelated to the cortisone injections. Mrs. Allison thereafter sought the services of another physician, Dr. Litton, who removed the cyst on August 9, 1978.

General Allison wrote to Dr. Crain on October 18, 1978, requesting reimbursement of medical expenses resulting from Mrs. Allison's infection. The bills were paid after Dr. Crain submitted them to his insurance company; however, it is unclear whether Dr. Crain's or General Allison's insurance company paid.

In November 1978, Dr. Thomas R. Shepler, a third physician and unrelated to appellants, performed exploratory surgery and fused the distal interphalangeal joint of Mrs. Allison's right index finger. Mrs. Allison recovered and appellees' lives returned to normal as of the spring of 1979.

I

It is not disputed that appellants had a duty to inform Mrs. Allison of the risks associated with treatment of her condition so that her consent to treatment would be an informed one. The elements of causation and damages are not questioned on this appeal. Whether appellants breached their duty of care is at issue.

■ The duty of a physician to inform the patient of the consequences of a proposed treatment stems from the right of every competent adult human being to determine what shall be done with his own body. *In re Boyd,* D.C.App., 403 A.2d 744, 748 n.8 (1979); *Schloendorff v. Society of New York Hospital,* 211 N.Y. 125, 129, 105 N.E. 92, 93 (1914). Because most people are ignorant in the medical sciences, they rely heavily on the knowledge and advice of their physicians. *See Cobbs v. Grant,* 8 Cal.3d 229, 104 Cal.Rptr. 505, 513, 502 P.2d 1, 9 (1972). However, the ultimate decision to undergo or to reject a proposed treatment lies with the patient. *Sard v. Hardy,* 281 Md. 432, 443, 379 A.2d 1014, 1021 (1977); *Cobbs v. Grant, supra* 104 Cal.Rptr. at 514, 502 P.2d at 10. In order to make an intelligent and informed choice, a patient must first obtain the facts necessary to make the decision from the physician. *See Cobbs v. Grant, supra* 104 Cal.Rptr. at 515, 502 P.2d at 11. There is a dichotomy among the jurisdictions, however, as to the proper scope of the physician's duty to disclose.[3] Some jurisdictions maintain a professional standard of care in which physicians are bound to disclose only information which is commonly disclosed by physicians practicing in the locality.[4] This rule makes it difficult for plaintiffs to establish a prima facie case because of the practical difficulties in getting a member of the medical fraternity to

3. *Woolley v. Henderson,* 418 A.2d 1123, 1128–29 (Me.1980). *See generally* 88 A.L.R.3d 1008–09 (1978).

4. *See* 88 A.L.R.3d, *supra* at 1020.

breach the "community of silence" and testify against a colleague. *Wilkinson v. Vesey*, 110 R.I. 606, 623, 295 A.2d 676, 687 (1972), citing *Cooper v. Roberts*, 220 Pa.Super.Ct. 260, 286 A.2d 647 (1971); see *Sard v. Hardy, supra*, 281 Md. at 442–43, 379 A.2d at 1021–22. We prefer the more modern rule in which the standard is established in law and the scope of mandatory disclosure is measured by the informational needs of the patient.[5] Although we are not bound by the Circuit Court's opinion in *Canterbury v. Spence*, 150 U.S.App.D.C. 263, 464 F.2d 772, *cert. denied*, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972),[6] we agree with the decision and its rationale. We hold, therefore, that the standard for measuring performance of the physician's duty to disclose is conduct which is reasonable under the circumstances.[7]

The test for mandatory disclosure of information on treatment of the patient's condition is whether a reasonable person in what the physician knows or should know to be the patient's position would consider the information material to his decision.[8] The information is material if the reasonable person in what the physician knows or should know to be the patient's position would be likely to attach significance to the risks in deciding to accept or forego the proposed treatment. *Small v. Gifford Memorial Hospital*, 133 Vt. 552, 557, 349 A.2d 703, 706 (1975); *Canterbury v. Spence, supra* 150 U.S.App.D.C. at 278, 464 F.2d at

787. "If, but only if, the fact-finder can say that the physician's communication was unreasonably inadequate is an imposition of liability ... justified." *Canterbury v. Spence, supra* 150 U.S.App.D.C. at 278, 464 F.2d at 787. Thus, not all risks need be disclosed; only material risks must be disclosed. *Sard v. Hardy, supra* 281 Md. at 444, 379 A.2d at 1022; *Wilkinson v. Vesey, supra* 110 R.I. at 627, 295 A.2d at 689. Additionally, a physician need not advise concerning risks of which the patient already has actual knowledge. *Sard v. Hardy, supra* 281 Md. at 445, 379 A.2d at 1022; *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis.2d 1, 13, 227 N.W.2d 647, 653 (1975); *Wilkinson v. Vesey, supra* 110 R.I. at 627, 295 A.2d at 689; *Canterbury v. Spence, supra* 150 U.S.App.D.C. at 279, 464 F.2d at 788. Because different patients have varying needs for information, the scope of disclosure will vary even among patients with the same condition.[9] However, at a minimum, a physician must disclose the nature of the condition, the nature of the proposed treatment, any alternate treatment procedures, and the nature and degree of risks and benefits inherent in undergoing and in abstaining from the proposed treatment.[10] Consent obtained without divulging this information is ineffective to grant the physician permission to institute the proposed treatment. *Scott v. Bradford*, 606 P.2d 554, 556–57 (Okl.1979). A physician is relieved of his duty to inform his patient (1) in an

5. *Sard v. Hardy, supra* at 442, 379 A.2d at 1021.

6. M. A. P. v. Ryan, *D.C.App., 285 A.2d 310 (1971).*

7. *Scott v. Bradford*, 606 P.2d 554, 557–58 (Okl. 1979); *Sard v. Hardy, supra* 281 Md. at 444, 379 A.2d at 1022; *Scaria v. St. Paul Fire & Marine Ins. Co.*, 68 Wis.2d 1, 13, 227 N.W.2d 647, 654 (1975). *See generally Morrison v. MacNamara*, D.C.App., 407 A.2d 555, 560 (1979).

8. *Sard v. Hardy, supra* 281 Md. at 444, 379 A.2d at 1022; *Wilkinson v. Vesey, supra* 110 R.I. at 627, 295 A.2d at 689; *Canterbury v. Spence, supra* 150 U.S.App.D.C. at 277–78, 464 F.2d at 786–87; *Cooper v. Roberts, supra* 220 Pa.Super.Ct. at 267–68, 286 A.2d at 650–51.

9. *Scott v. Bradford, supra* at 558; *Wilkinson v. Vesey, supra* 110 R.I. at 625, 295 A.2d at

688; see *Sard v. Hardy, supra* 281 Md. at 443–44, 379 A.2d at 1022; *Canterbury v. Spence, supra* 150 U.S.App.D.C. at 277–78, 464 F.2d at 786–87; *accord, Henderson v. Milobsky*, 193 U.S. App.D.C. 269, 271 n.8, 595 F.2d 654, 656 n.8 (1978) (a patient has the right to refuse to be told of any risks inherent in a procedure, or to learn everything material about the proposed and alternate procedures).

10. *Miller v. Van Newkirk*, 628 P.2d 143, 146 (Colo.App.1980); *Sauro v. Shea*, 390 A.2d 259, 263, 257 Pa.Super.Ct. 87, 94 (1978); *Sard v. Hardy, supra* 281 Md. at 440, 379 A.2d at 1020; *Canterbury v. Spence, supra* 150 U.S.App.D.C. at 278–79, 464 F.2d at 787–88. *See Dunham v. Wright*, 423 F.2d 940, 944 (3d Cir. 1970) (applying Pennsylvania law).

emergency situation when the patient is incapable of consent, no relative or guardian can be obtained to give the necessary consent to the treatment, and imminent harm from non-treatment outweighs any harm threatened by the proposed treatment; and (2) when the physician reasonably believes that the patient's reaction to the risk information will pose a threat to the patient's well being.[11]

■ Appellant Crain contends that in this case the issue of the reasonableness of his disclosure should not have been submitted to the jury.

On review of a [motion for a] directed verdict, the evidence must be viewed most favorably to the party against whom the motion is made, and that party must be given the benefit of all reasonable inferences from the evidence. . . . "With the evidence so viewed, a verdict may be directed only when the evidence is so clear that reasonable men could reach but one conclusion." [*Corley v. BP Oil Corp.*, D.C.App., 402 A.2d 1258, 1263 (1979), quoting *Bauman v. Sragow*, D.C. App., 308 A.2d 243, 244 (1973); citations omitted.]

Although the general rule is that juries may not establish the standard of care of a physician without the aid of expert testimony,[12] it has been increasingly recognized that informed consent cases are an exception to that rule. *E.g., Canterbury v. Spence, supra* 150 U.S.App.D.C. at 283, 464 F.2d at 792. *But see Woolley v. Henderson*, 418 A.2d 1123, 1131 (Me.1980). Thus, establishing the reasonableness of appellants' disclosure to appellees was a proper subject

for the jury. *Sauro v. Shea*, 390 A.2d 259, 263, 257 Pa.Super.Ct. 87, 94 (1978).

■ Although expert testimony is not needed to establish the scope of or the breach of the duty to inform one's patients before treating them, we note that expert testimony is necessary to establish the nature and degree of the risks of the proposed and alternate treatments, the probability of therapeutic success, and whether disclosure would be detrimental to a particular patient. *Sard v. Hardy, supra* 281 Md. at 447–48, 379 A.2d at 1024. Appellants contend that disclosure here was unnecessary since appellees were already aware of the hazards associated with cortisone injections. Although General Allison testified that he was aware of a general risk of infection and Mrs. Allison testified that she was concerned about the risk of infection before having the injections, neither was aware of the degree of harm threatened, alternative modes of treatment or likely results if no treatment was undertaken.[13]

■ Appellees testified that appellants failed to warn them of the risk of infection associated with cortisone injections before embarking on that course of treatment. We agree that the jury could find this was a material risk. Mrs. Allison testified that she would not have agreed to the injections had she been aware of the risk of infection.[14] In fact, Mrs. Allison's finger did become infected as a result of the treatment, and Mrs. Allison suffered pain from the infection. Although there was no expert testimony on the standard of care of a physician in obtaining informed consent

11. *See Woods v. Brumlop*, 71 N.M. 221, 228, 377 P.2d 520, 525 (1962); *Sard v. Hardy, supra* 281 Md. at 444–45, 379 A.2d at 1022; *Canterbury v. Spence, supra* 150 U.S.App.D.C. at 279–80, 464 F.2d at 788–89.

12. *Robbins v. Footer*, 179 U.S.App.D.C. 389, 392–93, 553 F.2d 123, 126–27 (1977); *Kim v. Anderson*, 610 P.2d 1270, 1271 (Utah 1980). *See, e.g., Baylor v. United States*, D.C.App., 407 A.2d 664, 670 (1979).

13. Appellants cite *Canterbury* to support their contention that physicians need not disclose the risk of infection to persons of average so-

phistication. While we do not discount appellees' sophistication, we note that *Canterbury's* discussion, in dictum, of permissive disclosure of the risk of infection relates solely to operations, a procedure which is not involved in this case.

14. Although the patient's testimony is relevant on the issue of causation, the test of causation is objective. The test is what would a prudent person in the patient's position have decided if informed of all relevant factors (*see* text *supra* at note 10). *See Canterbury v. Spence, supra* 150 U.S.App.D.C. at 282, 464 F.2d at 791.

from his patients, there was expert testimony on the actual risks involved. Thus, appellees established a prima facie case of medical malpractice. *See Scott v. Bradford, supra* at 559.

Appellants asserted that Dr. Crain had given Mrs. Allison an adequate warning before treatment and that, in any event, appellees knew in advance of the risk of infection. Thus, there were disputed questions of fact, and more than one conclusion could have been drawn from the testimony. "When non-disclosure of a particular risk is open to debate, the issue is for the finder of facts." *Id.* at 558 (footnote omitted). Under the facts of this case, we conclude that it was proper to submit the case to the jury on the issue of informed consent. Moreover, the jury could fairly conclude from the evidence that warnings were not given or, if given, were unreasonably inadequate under the circumstances.

## II

■ Appellants complain that they were prejudiced by not being allowed to impeach one of their witnesses, Dr. Shepler. In this jurisdiction, parties may not impeach their witnesses in the absence of surprise. *Scott v. United States*, D.C.App., 412 A.2d 364, 367 (1980); D.C.Code 1981, § 14–102.[15] In his deposition, Dr. Shepler testified that he was unable to state with a reasonable degree of medical certainty that Mrs. Allison had osteomyelitis in the index finger of her right hand. In response to the question, "[D]id you think in your best judgment there was an infection?", Dr. Shepler replied, "... I thought there was an infection ... but I didn't see the obvious, usual things where you say no question that was an infection." He additionally testified as follows in his deposition:

15. D.C.Code 1981, § 14–102 provides:

When the court is satisfied that the party producing a witness has been taken by surprise by the testimony of the witness, it may allow the party to prove, for the purpose only of affecting the credibility of the witness, that the witness has made to the party or to his attorney statements substantially variant

I made a presumptive diagnosis prior to my surgery she had osteomyelitis ... I felt at the end of the case, and that is the only time I could really say with more of a degree of certainty, that I did have an infected process of bone because it is difficult, like crazy, to make that diagnosis that I felt that I had osteomyelitis. My gut level feeling at the end of the case, I had an osteomyelitis ....

\*　　\*　　\*　　\*　　\*　　\*

[H]istorically I thought there was an osteomyelitis, okay, can never be 100 percent sure of that ....

I can only say when I had seen her, she had an open wound in her finger, gone under the presumptive diagnosis, because of the long history of opening and closing, never healing, there was probably an osteomyelitis....

The trial judge found that Dr. Shepler had testified both ways in his deposition, that is, he testified that there was probably an infection, yet he could not so state to a reasonable degree of medical certainty. He observed that the witness may have incorrectly thought that "reasonable degree of medical certainty" meant "certainty."

■ At trial, Dr. Shepler testified that in his opinion to a "reasonable degree of medical certainty," Mrs. Allison's right index finger was infected with osteomyelitis. Because the deposition testimony was ambiguous, the trial court found that appellant could not have been truly surprised by the trial testimony. This ruling may not be disturbed by this court unless it plainly appears that the ruling is without any rational basis. *Parker v. United States*, D.C. App., 363 A.2d 975, 977 (1976). We conclude that the excerpted deposition testimony provided the trial court with a rational basis for deciding that the witness' trial testimony was not substantially variant

from his sworn testimony about material facts in the cause. Before such proof is given, the circumstances of the supposed statement sufficient to designate the particular occasion must be mentioned to the witness, and he must be asked whether or not he made the statements and if so allowed to explain them.

from his deposition testimony. Accordingly, appellants cannot prevail on this claim of error.

### III

■ Appellants' final contention is that the trial court improperly admitted into evidence a letter written by General Allison to Dr. Crain requesting reimbursement for medical expenses resulting from the infection of Mrs. Allison's finger. Although hearsay[16] statements generally are inadmissible, the letter was admitted into evidence under an exception to the hearsay rule to prove an admission by silence of Dr. Crain. Under this exception, where the parties are engaged in a business or other relationship or transaction in a situation which would make it improbable for an untrue communication concerning the relationship or transaction to be ignored, the failure to reply to a letter which contains statements which the addressee would normally deny if untrue is receivable as evidence of an admission by silence. *Megarry Brothers, Inc. v. United States,* 404 F.2d 479, 488 (8th Cir. 1968); McCormick on Evidence § 270 (2d ed. 1972). The parties clearly fall under this exception. Dr. Crain had an on-going relationship with appellees at the time the letter was sent, and it would be improbable that a physician would ignore a letter placing on him liability for an infection which he did not cause. Dr. Crain explained that he could not reveal his response to the jury because that would have necessitated mentioning insurance, a subject which is kept from the jury on the issue of liability. We reject this contention because the evidence indicates that Dr. Crain was not "gagged." He called General Allison after receiving the letter. Had he believed himself not responsible for the infec-

tion, he could have so stated to appellees and to the jury, without mentioning insurance.[17]

■ Appellants contend that admitting the letter into evidence violates the general rule excluding offers of compromise on the issue of liability. *See Farnum v. Colbert,* D.C.App., 293 A.2d 279, 282 (1972); McCormick, *supra* at § 274. This contention is erroneous. In *Hanlon v. Lindberg,* 319 Ill. App. 1, 7, 48 N.E.2d 735, 738 (1943), the court concluded that an offer to pay the medical bills of the adverse party was not inadmissible on the ground that it was a disputed offer of compromise. The court noted that there was no attempt by the parties to settle a disputed claim and that, in general, declarations of an adverse party are admissible against him. *Norling v. Carr,* 211 F.2d 897, 901 (7th Cir. 1954), relying on *Hanlon,* also concluded that the defendant's offer to pay plaintiff's medical expenses which arose out of a hunting accident, was not an offer in compromise. Offers to pay or settle made *before* a controversy are distinguishable from offers made after a controversy has arisen. 4 Wigmore, Evidence § 1061 n.1 (Chadbourne rev. 1972); *see Allstate Insurance Co. v. Winnemore,* 413 F.2d 858, 863 (5th Cir. 1969). The rule against admitting offers of compromise refers to those offers made after a controversy has arisen and is based on the policy which encourages settlement over litigation. *Id.* at 863 n.10; *Farnum v. Colbert, supra* at 282. Obviously, this rule is not invoked in the absence of a dispute. *Allstate Insurance Co. v. Winnemore, supra* at 863 n.10; *see Megarry Brothers, Inc. v. United States, supra* at 485.

■ General Allison's letter to Dr. Crain states, "I confirmed with you that settlement of the medical expenses for surgery

---

16. *Hearsay evidence is testimony in court, or written evidence, of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court asserter.* [McCormick on Evidence § 246 (2d ed. 1972); footnote omitted; emphasis in original.]

17. Even if Dr. Crain, as he argues, could not have explained his silence without revealing the fact of his insurance coverage, the evidence of his insurance coverage would not have been admitted directly on the issue of his liability and hence would not have been impermissible. Furthermore, the probative value of admission of the letter outweighed any potentially prejudicial effects.

would be your responsibility." Because the parties were not engaged in a dispute at the time the letter was written, this letter could not have been written in the context of any settlement negotiations. We agree with the trial judge that the word "settlement" as used in this context means "payment" and conclude that the statement is not an offer of compromise nor a compromise agreement.

Accordingly, we conclude that there was no error in admitting the letter into evidence.

*Affirmed.*