528 A.2d 606

**Josephine J. JOZSA and Edward A. Jozsa, Her Husband, Appellants,**

v.

**Jonathan E. HOTTENSTEIN, M.D., Appellee.**

Superior Court of Pennsylvania.

Argued Oct. 7, 1986.

Filed May 14, 1987.

Reargument Denied July 27, 1987.

Richard J. Catalano, North Versailles, for appellants.
Louis C. Long, Pittsburgh, for appellee.

Before DEL SOLE, KELLY and POPOVICH, JJ.

DEL SOLE, Judge:

The instant appeal stems from a medical malpractice action in which judgment was entered against Appellants, Josephine and Edward Jozsa. The primary theory advanced by Appellants was lack of informed consent. At the conclusion of the testimony, the trial judge directed a verdict in favor of Appellee, Jonathan Hottenstein, M.D. Post-trial motions were denied, and Appellants raise a single issue before this Court: did the trial court err in directing the verdict.

We begin our discussion with our appellate scope of review. "On a motion for a directed verdict, the trial court must accept as true all facts and inferences tending to support the contentions of the party against whom the motion has been made, rejecting all testimony and references to the contrary." *Bucchianeri v. Equitable Gas Co.*, 341 Pa.Super. 319, 328, 491 A.2d 835, 840 (1985) (citations omitted). Our review of such decisions rendered at the trial court level centers on whether there exists 'an abuse of discretion or error of law which controlled the outcome of the case'. *Ibid.*, citing *McDevitt v. Terminal Warehouse Co.*, 304 Pa.Super. 438, 442, 450 A.2d 991, 993 (1982).

The facts viewed in this light are as follows. In April, 1979, Josephine Jozsa was involved in an automobile accident where she suffered various injuries, including an injury to her cervical spine. Mrs. Jozsa was treated by Dr. Hottenstein for her injuries. As part of her treatment, the Doctor placed Mrs. Jozsa under a program of conservative treatment and therapy for her cervical injury which included outpatient and inpatient physical therapy at Sewickley Valley Hospital. On or about July 26, 1979, Dr. Hottenstein performed a right carpal tunnel release operation on Mrs. Jozsa as an outpatient at Sewickley Valley Hospital.

Both Appellants testified that Dr. Hottenstein did not advise them of any risks or possible complications prior to the surgery. They also testified that they were advised by

Dr. Hottenstein that the surgical procedure, i.e., the carpal tunnel operation, could be done in an attempt to alleviate the wife's neck pain which had bothered her since her accident. The Appellants' account of what was told to them by Dr. Hottenstein concerning the benefit Mrs. Jozsa might expect as to relief of her neck pain was supported by Appellee's own testimony. Based solely on the Appellee-doctor's explanation that the surgery could alleviate her neck pain, Mrs. Jozsa agreed to have the operation. However, Dr. Hottenstein admitted that a carpal tunnel syndrome cannot cause cervical neck pain, and Dr. Imbriglia, Mrs. Jozsa's subsequent treating physician, testified that a carpal tunnel syndrome release should not be performed to treat a cervical strain. Dr. Imbriglia also testified that he did not think carpal tunnel syndrome causes neck pain.

As a result of the surgery, Mrs. Jozsa experienced extensive post operative complications including severe pain, swelling and impairment of motion and strength in her right hand which lasted seven months. Mrs. Jozsa also developed scar tissue formation of the median nerve, a complication which ultimately necessitated corrective surgery, which was performed by Dr. Imbriglia in February of 1980. Appellee, in his own case, admitted that the scar tissue formation was a complication. Dr. Imbriglia testified that the percentage of recurrence for carpal tunnel was 4–5%. Mrs. Jozsa, her husband, and Dr. Hottenstein all testified that she had no problem with her hand (prior to the carpal tunnel surgery) for which she was seeking medical help. At trial Mrs. Jozsa testified that she still has problems with pain and swelling of her right wrist when she attempts certain activities.

Appellants do not dispute Appellee's diagnosis of carpal tunnel syndrome, nor do they argue that Appellee was negligent. Rather, they contend Appellee performed the surgery without having secured informed consent from his patient.

In Pennsylvania, a patient's consent to a medical treatment is valid if:

"the physician disclosed all those facts, risks and alternatives that a reasonable man in the situation which the physician knew or should have known to be the plaintiff's, would deem significant in making a decision to undergo the recommended treatment .... The physician is bound to disclose only those risks which a reasonable man would consider material to his decision whether or not to undergo treatment."

*Cooper v. Roberts,* 220 Pa.Super. 260, 286 A.2d 647, 650 (1972).

Under *Cooper,* materiality is determined by the reasonable man standard. Clearly, "determinations of what a reasonable man would do or consider significant within the context of a particular set of facts is standard fare for jurors, for which they need no expert assistance." *Festa v. Greenberg,* 354 Pa.Super. 346, 357, 511 A.2d 1371, 1377 (1986), citing *Cooper v. Roberts,* 286 A.2d at 651.

In the above cited case of *Festa v. Greenberg,* this Court attempted to clarify the confusion that is present in informed consent cases. *Festa* holds that medical testimony is "necessary to establish the existence, magnitude and other relevant scientific characteristics of the risks of a recommended medical procedure and viable alternatives". *Ibid.,* 354 Pa.Superior Ct. at 357, 511 A.2d at 1377.

*Cooper* and *Festa* do not contradict one another, but rather illustrate that determination of materiality is a two step process. Initially, the trier of fact must be provided with expert information as to the nature of the harm which may result and the probability of its occurrence. But following this, it is the trier of fact that must decide the materiality of these risks; whether that probability of that type of harm is a risk which a reasonable patient would consider in deciding on treatment. *Festa, supra.*

The case *sub judice* gives us an excellent opportunity to clarify *Festa* even further. The trial court found that since the expert testimony only established that there was a 4–5% risk of recurrence, and no expert testimony was offered as

to alternative procedures or their feasibility, that the Appel-. lee was entitled to a directed verdict. We disagree.

■ The law is very clear that once expert medical testimony establishes that there was a risk of any nature to the patient that he or she was not informed of, and after surgery the patient suffers from that undisclosed risk, it is for the jury to decide whether the omission was material to an informed consent.

■ *Festa* holds that expert testimony is mandatory to establish existence of risks, existence of alternative methods of treatment and existence of risks attendant with such alternatives. It does not hold that expert testimony must establish all of the above before the question of whether there was an informed consent can go to the jury. We emphasize that once expert testimony establishes the existence of an undisclosed risk of a recommended medical procedure (or of any of the above-mentioned factors), it is the role of the jury to decide whether that type of harm if it occurs, is a risk which a reasonable patient would consider in deciding on whether to undergo or reject the procedure.

■ Therefore, since the record in this case supports the Appellants' position that the Appellee-Doctor did not inform them of the medically attested to recurrence rate of 4–5%, which was a known risk, the Appellants' case should have been permitted to go to the jury. The trier of fact has to be the arbiter of what constitutes a material risk for the patient.

Accordingly, the trial court erred in directing a verdict in favor of the Appellee. The Judgment of the trial court is vacated and this case is remanded for a hearing consistent with the findings expressed herein.

POPOVICH, J., files a dissenting opinion.

POPOVICH, Judge, dissenting:

I must dissent. The majority opinion in its attempt to "clarify" *Festa v. Greenberg*, 354 Pa.Super. 346, 511 A.2d

1371 (1986) has ignored the clear language of that case. In *Festa*, decided less than a year ago, this Court stated:

> [Expert] testimony is still required to *establish the existence of risks* in a particular medical procedure, the *existence of alternative procedures* and the *feasibility of these alternatives* in the patient's case. Expert medical testimony is essential in this limited context because the average lay juror does not possess the requisite technical or medical knowledge to determine if the facts are true as alleged by the petitioner.

Id., 354 Pa.Super. at 357, 511 A.2d at 1377. (Emphasis in original).

I do not agree with the majority's conclusion that expert testimony is not mandatory to establish the existence of risks, existence of alternate methods of treatment and risks attendant with such alternative. The majority holds expert testimony is necessary *only* to establish the existence of risks. *Festa*, supra, however, dictates otherwise. *Festa* lists all three aspects—(1) existence of risks, (2) existence of alternate methods of treatment; (3) risks of alternate treatment—and couples these three aspects with the conjunctive "and". The language of *Festa* makes absolutely no sense unless it is interpreted as requiring expert testimony for establishing all three prongs. I am further convinced this is the intent of *Festa* because in the passage quoted above, our Court chose to emphasize this particular point by italicizing *all three* areas as requiring expert testimony.

The trial judge's determination that the record in this case is devoid of any evidence as to the seriousness of carpal tunnel surgery, its risks, complications and alternatives in light of this patient's situation and condition at the time of her consent was correct. The only medical testimony offered was that of Dr. Imbriglia, the treating physician who performed the second surgery, and the testimony of appellee. Appellants contend there could have been no informed consent because they were misinformed as to the expected results of the surgery. However, appellants both testified appellee explained it was the nerve in the hand

upon which he would operate. Appellants contend since they were told the surgery would help the neck pain they were misinformed because carpal tunnel surgery would never alleviate neck pain.

The record, however, does not support appellants' position. Both appellants and both experts agree that shortly before the surgery Josephine Jozsa suffered pain in her neck, shoulders and arm. (N.T. 2/11/86, pp. 13, 16–17, 53, 64; N.T. 9/15/83 pp. 6, 8, 26). Appellants rely on the following testimony by Dr. Imbriglia:

Q. Doctor, in terms of treatment, can you tell us whether or not a carpal tunnel release operation or surgery, whether that, in your opinion, is a useful or beneficial surgery in treatment of cervical strain?

A. I don't think for a pure cervical strain that a carpal tunnel release should be performed. (N.T. 9/15/83, p. 17)

This statement would support appellants' misinformation theory if Mrs. Jozsa had been suffering from "pure cervical strain." However, Dr. Imbriglia reported that Mrs. Jozsa did suffer shoulder and arm pain prior to the first surgery and stated:

Q. Now, Doctor, you were asked by Mr. Catalano whether or not carpal tunnel surgery such as that that was undertaken by Dr. Hottenstein would be useful or beneficial and I think he said in an instance where a patient complained of pure whatever that is, cervical strain. And you said no, that isn't an ordinary course of treatment, but I believe you said that it's not uncommon to find carpal tunnel syndrome with pain reflected up into the arm and into the shoulder; is that correct?

A. That's correct.

Q. In fact, there are instances in the literature where shoulder and neck pain are discussed as a result of carpal tunnel syndrome; is that correct?

A. Correct.

Q. And then would it be logical, would it be a fact, that if you correct the carpal tunnel problem, the consequen-

tial pain in the neck and shoulder and the arm will hopefully diminish or go away?

A. Often the pain in the arm and the shoulder can go away. From what—from my experience I do not think carpal tunnel syndrome causes neck pain. I think it can cause shoulder pain. I don't think it causes neck pain. N.T. 9/15/83, pp. 29–30.

Josephine Jozsa testified that appellee told her that pain radiates from the wrist up to the arm and neck, and he advised her to "take a shot in the dark" and release the nerve in the hand to see if it would relieve some of the pain. (N.T. 2/11/86 pp. 16–17). This information is compatible with Dr. Imbriglia's testimony.

Definitive expert testimony was essential because the average lay juror could not possess the technical knowledge to determine whether the surgery could have eased Mrs. Jozsa's pain. Without further expert testimony, the jury would have had to speculate improperly whether appellants were misinformed as to the purpose of the surgery. The trial judge properly granted a directed verdict.