563 A.2d 1217

**Vicki L. MOURE, n/b/m Vicki L.M. Via, Appellant,**

**v.**

**Randall R. RAEUCHELE, D.O. and Community General Osteopathic Hospital, Appellee.**

Superior Court of Pennsylvania.

Argued March 7, 1989.

Filed Aug. 18, 1989.

Reargument Denied Sept. 25, 1989.

Petition for Allowance of Appeal
Granted Jan. 19, 1990.

128

Martin S. Hohenadel, Lancaster, for appellant.

Peter J. Curry, Harrisburg, for appellee.

Before McEWEN, OLSZEWSKI and POPOVICH, JJ.

POPOVICH, Judge:

This is an appeal from the order denying post trial motions entered in the Court of Common Pleas of Dauphin County following a verdict in favor of the appellee Randall R. Raeuchele, D.O. In this medical malpractice suit, the appellant's claims under theories of negligence and informed consent were rejected by the jury. Timely post trial motions for judgment n.o.v. and new trial were filed by the appellant and denied on September 7, 1988. We reverse and remand.

On appeal the appellant, Vicki Via, raises the following issues:

(1) Whether the lower court erred in denying her post trial motions for judgment n.o.v. on her informed consent claim where the defendant doctor testified that he did not inform her of or discuss with her alternative procedures concerning reproductive surgery then available to her.

(2) Whether the lower court erred in refusing her post trial motion for judgment n.o.v. where evidence at trial demonstrated that the doctor proceeded with the performance of a cuffed tuboplasty upon her without informing her of the material risk concerning her future fertility, alternative methods for performing the same or similar

surgery or the possible effects the surgery would have regarding her ability to become pregnant.

Briefly, the facts are these as stated by the lower court:

Vicki and her boyfriend with whom she is now married had been living together for approximately five years when they decided to marry, though no definite plans were made. During this time, they engaged in sexual intercourse, but never used contraceptives. Since having children was important to them, they contacted their family physician to determine their fertility. A sperm count revealed that if there was a problem, it was with Vicki. She was then referred to [Randall R. Raeuchele, D.O., the appellee], who was highly recommended by their physician.

Vicki first saw Dr. Raeuchele on March 8, 1982, at which time he performed a pelvic exam which revealed that she was normal. According to Vicki, the doctor discussed two procedures for determining whether she could conceive. (N.T. 202) The purpose of these tests were to determine Vicki's "tubal patency" meaning whether her fallopian tubes were open and receptive to egg and sperm migration. (N.T. 264) One of the test was to inject air into the cervix, and if the tubes were open, the air would pass through the tubes and into the abdominal cavity. However, because of the pain associated with this test, the discussion centered on the laparoscopic examination. (N.T. 202, 265, 273)

A laparoscopy requires a small incision at or near the navel, the inflation of the abdomen with carbon monoxide, and the insertion of a lighted tube for the purpose of a visual examination of the patient's abdominal region, including the reproductive organs. (N.T. 265–266) The patient is placed under anesthesia and, according to Vicki, the operation would take approximately fifteen (15) to twenty (20) minutes. Barring complications, scarring was to be minimal. (N.T. 202-3, 272)

Vicki testified that the doctor never discussed microsurgery as an alternative to laparoscopic (macro) surgery, he

did not advise her of the risks to her fertility. She did indicate, however, that the doctor advised her of the risks associated with surgery and laparoscopy in general. (N.T. 206, 214) Indeed, Vicki insisted that the operation was exploratory only, and that she did not consent to corrective surgery. (N.T. 206, 214)

The doctor testified at great length and detail, in narrative form, concerning the events and discussions preceding the surgery. No where in his testimony is there an indication that he discussed microsurgery, risks to fertility, and the importance of timing. Further, on cross examination, he admitted that he did not discuss these matters. (N.T. 311–314) It was also undisputed that the surgery was not needed to save Vicki's life as there was no emergency. (N.T. 314) ...

[During the surgery] the doctor observed that Vicki's tubes were "clubbed" or closed. A blue "indigo carmine" dye was injected [into the tubes and it entered the right tube, but was unable to exit.] As to the left tube, there was no evidence of dye at any point. Consequently, the doctor tore a hole in the fimbriated end of the left tube, which allowed the escape of [fluids which indicated that the tube was badly diseased].

Reconstructive surgery was then attempted on the right tube. [The tube was cut] and immediately the dye advanced through the end of the tube. (N.T. 295) [The doctor believed the tube was] diseased as well and "flimsy". (N.T. 303) ... In other words, the tissue was dead, and therefore, according to the doctor, its removal actually slightly improved Vicki's chance of becoming pregnant. He testified that this procedure, known as a salpingostomy,[1] is as statistically sound as microsurgery and that he did not consider Vicki to be a candidate for reconstructive miscrosurgery. (N.T. 358) ... The doctor's expert testified that macro-surgery "carries exactly the same preg-

---

1. Known as a "cuffed tuboplasty," the procedure involves the use of a small sutures to tie the end back to prevent it from collapsing. It was described as looking like a french cuff on a man's shirt. (N.T. 366).

nancy rate as microsurgery does in this section of the fallopian tube." [2]

On appeal the appellant contends that the lower court erred in not granting her post trial motion for judgment n.o.v. She avers that, based upon the Doctor's testimony, she was not informed of alternative procedures, risks to her future fertility and the importance of the timing of his actions.

The standard of review for the denial of a judgment n.o.v. was outlined in *Timbrook v. Foremost Insurance Co.*, 324 Pa.Super. 384, 471 A.2d 891 (1984):

> The standard which we employ when reviewing the denial of a motion of directed verdict and a motion for judgment n.o.v. is the same. We will reverse the lower court when we find "an abuse of discretion or an error of law which controlled the outcome of the case." *McDevitt v. Terminal Warehouse Co.*, 304 Pa.Super. 438, 442, 450 A.2d 991, 993 (1982). In ruling upon these motions, the trial judge must consider "the evidence, together with all reasonable inferences that may be drawn therefrom ... in the light most favorable to the verdict winner." *Carrender v. Fitterer*, 310 Pa.Super. 433, 436, 456 A.2d 1013, 1014 (1983).
>
> Accepting as true all facts and proper inferences which tend to support the contention of the party against whom the motion has been made, and rejecting all testimony and inferences to the contrary, the trial judge must grant said motions when no two reasonable minds could differ that, as a matter of law, the party has failed to make out his case. *Thomas v. Allegheny & Eastern Coal Co.*, 309 Pa.Super. 333, 455 A.2d 637 (1982).

*Timbrook*, supra, 324 Pa.Superior Ct. at 387, 471 A.2d at 892.

2. The court stated in a foot note to its opinion:
   It must be noted that the expert's opinion is entirely dependent upon the veracity of the doctor's testimony that the right tube was, in fact, [diseased]. This was sharply disputed at trial; however, as noted, we must accept the doctor's testimony.

Additionally, in *Northwest Savings Ass'n v. Distler*, 354 Pa.Super. 187, 511 A.2d 824 (1986), this Court said the grant of a judgment notwithstanding the verdict may only be entered in a clear case where the facts are such that no two reasonable persons could fail to agree that the verdict is improper. *Id.* (citing *Olson v. Dietz*, 347 Pa.Super. 1, 500 A.2d 125 (1985); *Sperrazza v. Cambridge Mutual Fire Ins. Co.*, 313 Pa.Super. 60, 459 A.2d 409 (1983). See also *Fleck v. Durawood*, 365 Pa.Super. 123, 529 A.2d 3, 5 (1987).

Given this standard of review, our next consideration is the law of informed consent. The doctrine of informed consent is grounded upon the tenet that a physician is precluded from administering to, or operating upon a patient without the patient's consent. We cite the language of *Defulvio v. Holst*, 272 Pa.Super. 221, 414 A.2d 1087 (1979) wherein the law to be applied in the matter at hand is clear:

The law in this Commonwealth is that where a patient is mentally and physically able to consult about his condition, in the absence of an emergency, his 'informed consent' ..., is a prerequisite to a surgical operation by his physician. *Defulvio v. Holst*, 272 Pa.Super. 221, 414 A.2d 1087 (1979) (citing *Cooper v. Roberts*, 220 Pa.Super. 260, 265, 286 A.2d 647, 649 (1971).

Consent to medical treatment is valid if:

[T]he physician disclosed all those facts, risks and alternatives that a reasonable man in the situation which the physician knew or should have known to be the plaintiff's, would deem significant in making a decision to undergo the recommended treatment ... the physician is bound to disclose only those risks which a reasonable man would consider material to his decision whether or not to undergo treatment. *Cooper*, supra at 260, 286 A.2d 647 (1971).

Further, the recent decision of *Sagala v. Tavares*, 367 Pa.Super. 573, 533 A.2d 165, 167 (1987) reiterated the "prudent patient" standard. Therefore, in determining whether a physician breached his duty to his patient:

[t]he standard of care is not what a reasonable medical practitioner would have done in the situation but whether the physician disclosed those risks which a reasonable man would have considered material to his decision whether or not to undergo treatment. *Festa v. Greenburg*, 354 Pa.Super. 346, 511 A.2d 1371, 1373 (1986). *Sagala*, supra, 367 Pa.Superior Ct. at 578, 533 A.2d at 167.

The importance of the prudent patient standard of review was further emphasized in *Sagala*, wherein the court stated;

The primary focus of Pennsylvania law with respect to informed consent is to guarantee that a patient is supplied with all the material facts from which an intelligent choice as to medical attention may be reached, *regardless of whether the patient chooses rationally.* *Cooper*, supra at 286 A.2d 650. Recovery is based on the administration of surgical procedure in the absence of the patient's informed consent, not whether the patient would not have gone through with the operation if warned of a particular danger. (emphasis in original)

*Sagala*, supra at 580–81, 533 A.2d at 168–169.

Materiality is established by a two-step process. First the trier of fact must be supplied with expert information as to the nature of the harm and the probability of it occurring. However, it is the trier of fact, not the expert, who must decide the materiality of the risk involved and whether the probability of that type of harm is a risk which a reasonable patient would consider in rendering a decision on medical treatment. *Sagala*, supra, 367 Pa.Superior Ct. at 577, 533 A.2d at 167, citing *Jozsa v. Hottenstein*, 364 Pa.Super. 469, 528 A.2d 606, 608 (1987); see also *Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663 (1966); *Jeffries v. McCague*, 242 Pa.Super. 76, 363 A.2d 1167 (1976).

Instantly, a judgment n.o.v. will be entered as a matter of law if we find that Doctor Raeuchele failed to inform the appellant of those risks which he knew or should have known to be material to the appellant when she was making her decision to undergo laparoscopic surgery. See *Sagala*,

supra, 367 Pa.Superior Ct. at 577, 533 A.2d 167, citing *Festa v. Greenburg,* 354 Pa.Super. 346, 511 A.2d 1371, 1373 (1986). For consent to be valid, the physician must apprise the patient of the nature of the therapy, the seriousness of the situation, the disease and the potential results of the treatment. *Gray v. Grunnagle,* 423 Pa. 144, 223 A.2d 663 (1966). We will first examine the informed consent agreement that the appellant signed; then we will discuss the risks involved with tuboplastic surgery and whether or not the risks should have been disclosed to the appellant before the tuboplasty was performed.

The following language is the pertinent portion of the consent agreement signed by the two parties.

1. I hereby authorize Dr. R. Raeuchele and/or such assistants as may be selected by him, to treat the condition or conditions which appear indicated by the diagnostic studies already performed. Laparoscopy—Tubal Patency Test.

2. The procedure(s) necessary to treat my condition (has, have) been explained to me by Dr. R. Raeuchele and I understand the nature of the procedure(s) to be: Examination of the abdomen with a telescopic instrument with the treatment of any condition with the ovaries, tubes or other tissue that might be deemed necessary, including fulgeration (burning of tissue) at this time. I understand that one or two incisions may be used to carry out this procedure. I also understand that in an emergency, such as bleeding or a bowel burn or puncture my abdomen may have to be opened.

Injection of dye through the tubes to determine if the tubes are open.

3. It has been explained to me that during the course of the operation, unforeseen conditions may be revealed that necessitate an extension of the original procedure(s) or different procedure(s) than those set forth in Paragraph 2. I, therefore, authorize and request that the above named surgeon, his assistants, or his designees perform such surgical procedures as are necessary and desirable

in the exercise of professional judgment. The authority granted under this paragraph 3 shall extend to treating all conditions that require treatment and are not known to Dr. R. Raeuchele at the time the operation is commenced ...

4. I have been advised by my physician of certain risks and consequences that are associated or involved in the operation and alternative methods of treatment. I am aware that there are other risks, such as severe loss of blood, infection, cardiac arrest, etc., that are attendant to the performance of any surgical procedure ...

In reviewing the consent agreement, the Doctor was authorized to examine the appellant's reproductive organs and inject dye through her fallopian tubes to determine if the tubes were open. If a life-threatening situation were to arise, emergency surgery was also authorized. Paragraph three (3) authorized the Doctor to treat all conditions that were not known to him at the time the operation commenced.[3] Further, paragraph four (4) states that the appellant was advised of certain risks and alternative methods of treatment.[4] We note that the emergency surgery performed on the appellant was clearly within the consent agreement, and we are, therefor, only discussing the tuboplastic surgery in this appeal. The jury did not find the Doctor liable under the theory of negligence with regard to the severing of the appellant's ovarian artery.

The consent agreement does not mention the tuboplastic procedure, the risks associated with tuboplasty, or any of the other alternatives available to the appellant.[5] The

3. The agreement is very vague and does not specifically state the type of surgery or the risks of the surgery which the doctor could perform after the initial laparoscopic examination authorized pursuant to paragraph three (3).

4. The two procedures discussed with the appellant were the laparoscopic surgery and the injection of dye into her tubes. The only risks which are clearly discussed in the agreement are those risks associated with emergency surgery.

5. There were other alternatives for the appellant to consider: (1) a tuboplasty could be performed and she would be able to coordinate the surgery with her wedding and the building of their new home;

agreement gave the Doctor authorization to perform surgical procedures as "necessary and desirable in the exercise of professional judgment." We are reminded that the proper standard of review in this case is "not what a reasonable medical practitioner would have done in the situation but whether the physician disclosed those risks which a reasonable man or woman would have considered material to her decision whether or not to undergo treatment." *Sagala*, supra, 367 Pa.Superior Ct. at 578, 533 A.2d at 167.

In an effort to expand upon the consent agreement and determine the information the Doctor disclosed to the appellant prior to the laparoscopic examination, we turn to the record and review the testimony of the two parties. The following testimony, by Doctor Rauechele, reveals he did not discuss the "cuffing procedure" with the appellant or tell her the risks and consequences associated therein:

Q. Now, Doctor, have you told us in your direct testimony everything that you told Mrs. Via about what you planned to do in this surgery prior to the time that the surgery was done?

A. I think I did.

Q. Well, I want you to tell me, doctor, did you in fact tell us everything that you told her prior to the time the surgery was done?

A. At this point in time I think I told her everything that I can remember.

Q. And at the time that you planned to perform this surgery on May 8, 1982, I believe you told us that you did not know what you were going to encounter. Is that a true statement?

A. That's exactly right.

(N.T. p. 55) (2) an expert in reproductive medicine and/or a microsurgeon could be contacted regarding her clubbed fallopian tubes; (N.T. 164) (3) she could decide that adoption would be a better avenue to pursue given her specific complication; (4) she could attempt in vitro fertilization; (N.T. p. 236) and (5) she could choose not to have any surgery after considering the alternatives and risks associated with the type of surgery which would be necessary to enhance her chances of conceiving naturally.

Q. You did not know whether you would encounter disease of the fallopian tubes or you would not?

A. Right.

Q. The purpose of the procedure was to determine whether in fact there was disease of the fallopian tubes. Is that not correct?

A. That's correct. That's right.

Q. So you did not discuss with Mrs. Via the possibility of microsurgery, is that correct? I think you testified to that fact.

A. No. I didn't talk to her about microsurgery.

Q. And you did not tell her about the possible effects of any surgery that you would do on the fallopian tube. Is that not correct?

A. That's not correct.

Q. Did you testify this morning that you advised her about anything, the consequences of any procedure that you would do on the fallopian tubes?

A. Sure I did.

Q. Did you tell her at the time that you talked with her on March 8, 1982, that if you perform surgery in these fallopian tubes, that you might make matters worse?

A. I told her of the risks of this type of surgery. And if you want to consider that as making them worse, then I guess you would say it that way.

Q. Do you remember telling her what the alternatives were? Did you tell her the alternative forms of surgery?

A. Well, she came for a laparoscopic procedure. Her doctor told her that.

Q. Doctor, would you please answer the question.

A. No.

Q. And did you not discuss with her what the possible benefits of those alternate surgical procedures would be, is that not correct?

A. No. If I didn't talk about the—the answer is no.

Q. And you did not talk to her about the comparative risks in terms of her ability to attain fertility or the

various possible surgical procedures that might be done. Is that not correct, doctor?

A.. No. I didn't—no, that's right. I did not talk about the procedures. That's correct.

Doctors are required to disclose, before surgery, all those facts, risks and alternatives that a reasonable patient in the situation would consider significant and material to their decision. *Sagala*, supra, 367 Pa.Superior Ct. at 578, 533 A.2d at 167. The record reveals that the risks involved with the "cuffing procedure" are that: (1) The procedure is temporary in nature creating a very short period of time during which the appellant would have a chance of becoming pregnant (approximately three to six months); (2) the period of enhancement begins immediately after the "cuffing" procedure is performed. In this case, the appellant would have been trying to conceive before she was married; (3) often during tuboplasty surgery the fimbriae or the end of the fallopian tube may be cut off, and, as a result of that cutting, any reconstructive surgery on the delicate fimbriae through microsurgery is precluded forever; and (4) the fimbriae are essential for fertilization, and, where the fimbriae are removed during the tuboplastic procedure, the chance of a woman becoming pregnant is very slight. (N.T. 2/29–3/3/88 pp. 90, 99–104)

The materiality of the information the patient was to receive must be examined prior to the surgery. Presently, the appellant had discussed with the Doctor, before the surgery, her plans to be married; and that the couple was planning on building a home; and they wanted to determine if they could have children. (N.T. 2/29–3/3/88 p. 55) The appellant testified that she "gave the Doctor permission to look at [her], [and] to tell [her] what [was] wrong." (N.T. 2/29–3/3/88 p. 218) The appellant claims there was no discussion as to what procedures would be implemented after the exploratory surgery. Further, she claims he did not tell her the specific risks associated with the "cuffing procedure", or that there could be a number of alternative

methods of treatment for damaged fallopian tubes. (N.T. 2/29/–3/3/88 p. 216)

The doctor testified that he considered terminating the procedure but believed the appellant consented to having her tubes opened so he did not end the surgery after completing the investigatory portion of the laparoscopic examination.[6] Also, when asked if the surgery he per-

---

6.  Q.  Would it have been also, Doctor, accepted medical practice to have terminated the surgery and referred the patient to somebody who was a specialist in reproductive medicine in that field. And your answer at the time was what?
THE COURT: Read the answer.
A.  Yes.
Q.  But you elected to do neither of those things, neither to send her to somebody in reproductive medicine nor to send her to somebody in microsurgery, is that correct?
A.  I opened her tube.
Q.  You tore off the ends of one tube, is that not correct?
A.  I guess you could put it that way, yes. I tore off the end of the tube.
Q.  It was not necessary for you to either tear open the left tube or to cut off the end of the right tube in order to determine that here was an impediment of patency (openness) in those tubes, is that correct?  . . .
A.  It was not necessary, that's correct.
Q.  (After repairing the ruptured ovarian artery) [y]ou went back to that right tube again, is that right.
A.  That's correct . . .
Q.  You went back to the right fallopian tube, and now you cut off more of the tube. Is that correct?
A.  That's correct . . .
Q.  Would you agree with me, . . . that it is important in order to obtain pregnancy to maintain the fimbriae in performing surgery?
A.  Very important.
Q.  So that it is critical for the surgeon who is performing recon-structive surgery to endeavor to maintain the fimbriae.
A.  That's true.
Q.  Isn't it true that if the surgeon performs a salpingostomy with-out properly doing surgery on the fimbriae in order to maintain the fimbriae, that the patient's chances of becoming pregnant are rare?
A.  I guess that's true.
Q.  And in treatment of Mrs. Via, you had done the salpingostomy but you had not repaired the fimbriae, is that not correct?
A.  I'm sorry she had no fimbriae.
Q.  And yet your operative report, nowhere in the operative report is there any statement to the effect that this patient did not have any fimbria, is there, Doctor?

formed on the appellant enhanced her chances of becoming pregnant, he admitted that the procedure he performed rarely increased a patient's chances of pregnancy. He admitted that he removed the fimbriae, or the end of the fallopian tube, which effectively terminated the appellant's hopes of reconstructive microsurgery upon the fimbriae which must be present in order for a women to conceive naturally. (N.T. 2/29–3/3/88 p. 165–168, 175, 176, 177–78)

In conclusion, the Doctor performed the tuboplasty upon the appellant without disclosing the risks of the surgery, and we find that the risks would have been material to a reasonable person in the appellant's situation. *Cooper*, supra at 260, 286, 650 (1971). See also *Dunham v. Wright*, 423 F.2d 940 (3d Cir.1970) (The philosophy behind such theory of informed consent is that the patient has the right and responsibility to determine whether she wants to risk the suggested corrective surgery). The consent agreement did not discuss tuboplastic surgery or its risks, and the testimony during the trial reveals that he did not advise the appellant of the risks before the operation began. She was not informed that she could refuse the surgery all together, and she was not told that she would have to try to become pregnant immediately after the procedure or that the procedure could leave her barren.

The Doctor's decision that tuboplastic surgery was the most appropriate procedure for the appellant may have been reasonable given the appellant's situation. However, we find he performed the procedure without the consent of the appellant, and, therefor, he is liable under the law of informed consent. Whether or not the appellant benefited from the procedure is not the center of our review. *Bulman v. Myers*, 321 Pa.Super. 261, 467 A.2d 1353 (1983);

A. Well, that's pathology. Yes, there is not—there was no statement in my operative report to the effect that this patient had no fimbria as such, that's correct.

Q. And performing the salpingostomy, as you indicated ... you knew that the chances of her becoming pregnant were rare, isn't that true?

A. Yes, that's correct. (N.T. 2/29/88, 3/1–3/88 pp. 165–168, 175, 176, 177–78)

*Sauro v. Shea,* 257 Pa.Super. 87, 390 A.2d 259 (1978); *Dunham v. Wright,* 423 F.2d 940 (3d Cir.1970). See, e.g. *Mohr v. Williams,* 95 Minn. 261, 104 N.W. 12 (Supr.Ct. Minn.1905) the patient consented to surgery on her right ear. During the surgery, the physician corrected the same condition in her left ear. The court held he committed a technical battery upon his patient because no consent was given for the surgery on the left ear. The improved condition of the left ear was immaterial.[7]

We find that two reasonable minds would agree that, as a matter of law, Doctor Raeuchele, D.O. failed to disclose the risks of tuboplasty prior to surgery which would have been material to the appellant's decision to undergo the treatment. Based upon this error of law, we reverse the lower court's order denying the judgment n.o.v. and enter judgment in favor of the appellant. The case is hereby remanded to the lower court with instructions to conduct a trial to determine the appellant's damages.[8]

Case remanded with instructions. Jurisdiction relinquished.

McEWEN, J. files a dissenting opinion.

McEWEN, Judge, dissenting:

While I am hesitant to differ with the careful and compelling expression of view provided by the author of the

7. See *Corbett v. Weisband,* 380 Pa.Super. 292, 551 A.2d 1059 (1988) (plaintiff sued on a negligence theory alleging that her doctor had performed surgery on her knee that she had not authorized. The issue on appeal was whether or not the appellant filed her claim within the statute of limitations.)

8. We note that the record, briefs, and lower court opinion discuss in great length the alternative of microsurgery, which would have entailed the delicate procedure of repairing the clubbed end of the appellant's fallopian tube. Each party introduced expert testimony disputing whether the option of microsurgery was a viable alternative for the appellant. The jury believed the Doctor's testimony that the appellant was not a candidate for the reconstructive microsurgery. The lower court did not disturb the jury's determination that microsurgery was not a consideration which was material to the appellant's decision to undergo the tuboplastic surgery.

The issue of whether microsurgery was material to the appellant's decision need not be resolved presently in that the Doctor did not inform the appellant of the risks of tuboplasty.

majority opinion, I must, very respectfully, dissent from the decision of the majority to vacate the verdict of the jury and to enter judgment n.o.v. in favor of appellant, Vicki Via.

The majority correctly recites the standard of review applicable to a request for judgment n.o.v. on direct appeal, but proceeds to the drastic remedy of substituting its judgment for that of the jury after finding

"the Doctor performed the tuboplasty upon the appellant without disclosing the risks of the surgery, and we find that the risks would have been material to a reasonable person in the appellant's situation. The consent agreement did not discuss tuboplastic surgery or its risks, and the testimony during the trial reveals that [appellee, Dr. Raeuchele] did not advise the appellant of the risks before the operation began. She was not informed that she could refuse the surgery all together, and she was not told that she would have to try to become pregnant immediately after the procedure or that the procedure could leave her barren."

The majority so finds even though testimony, both expert and lay, on each of these issues was submitted to the jury which, based upon *its* resolution of the conflicting testimony, found that appellant had been informed of all of the material risks and had given her consent to the procedures performed upon her by the appellee, Dr. Randall R. Raeuchele.

It is settled beyond peradventure that this Court may not reevaluate the evidence and substitute its judgment for that of the jury. Rather, our role is to review the record solely for the purpose of ascertaining whether the evidence, when viewed in the light most favorable to the verdict winner, together with all reasonable inferences therefrom, is sufficient to support the verdict of the jury.

The record, when reviewed in this light, provides abundant basis for the verdict returned by the jury, as evidenced by the following excerpts from the testimony of appellee:

[Doctor Raeuchele]:

That's all right. Then I told her that in her case, we would look down and hopefully see the uterus and the tubes and the ovaries. And I then hastened to tell her that I had no idea what her trouble was at that time and that if we might run into adhesion, complete recovery— completely covering the uterus and the tubes.

And I told her if that happened, I would either have to back out and stop or else I could make a second incision down below in the suprapubic area. And we put an instrument in there. We called it a wand, and we can use it to manipulate the organs. Sometimes the uterus is lying back this way and you can't see the back of it so you put the wand in. Generally move it forward and you can look in back of the uterus and see the tubes and ovaries. And the tubes and ovaries are generally in back of the uterus so that I have to lift the uterus forward or manipulate it so that you can look back here.

Now, if there are a lot of adhesions down over the uterus, you are not going to see under here to see the tubes and the ovaries. So you have to tell the patient that if the examination would be founded, you are going to have to do one of two things. Either go in there and lift the uterus up and dissect those adhesions away so that you can look down to see the tubes and the ovaries or you are going to have to put instruments in to cut them so that you can subsequently finally pin the uterus forward and see the organs that you are concerned with....

I told her that we had to relieve adhesions perhaps if they were there, and she should expect that there would be a second incision, and that there would be possibly some laparoscopic surgery had to be performed before we could get into her tubes.

And I told her if we didn't have to perform the dissection, the adhesions and so forth, why, perhaps we could lift the uterus up and see the tubes. But if they were distended, if they were closed, if they were adherent to the undersurface of the uterus or the broad ligaments,

we would have to dissect them away to determine the full trouble that was causing her infertility.

And I said, now, do you want us to go through with this? If you don't, you have to tell me and we can just dispense with the whole thing. And she said, well, I'm here. I want to know what's going on and we'll go through with it.

Well, I said, Vicki, generally we don't run into things like this. Generally we can look in there and with a pretty good—pretty short period of time, we can tell what's going on. But I want you to know that if there's something wrong, it could be easily adjusted. Do you want me to take care of it? She said, well, yes. It's took me a long time to get here and while you are here, I want you to do everything that you can.

I said, well, I don't know how much—what extent—how extensive you want to be. Generally we can do it without too much trouble. But I want you to know that there can be trouble. There is a risk associated with this, and we can get in trouble here.

Now, I said, suppose if you had something wrong with your ovary like cancer, would you want me to take a piece of that ovary off and send it to the laboratory? Because if you had cancer, you should know it and maybe it would be early enough to have something done about it.

I never had any person, when I explained it this way to them, that said, no, no, don't do anything if I have cancer. Let it alone. If I have something else that you can take care of, I want you to do it because now is the time, I'm going to be asleep. It won't bother me, and I want you to take care of it.

So I said to Vicki, if I should be taking a piece of tissue from the ovary and would start to bleed, I would have to stop that bleeding. Or if I was doing something—if I released some adhesions around the tube—she wanted to get pregnant. So suppose the fimbriae that she was seeing here are stuck up against the broad ligaments. The broad ligament is the link that holds the tissue of the

ligaments up. I told her—and I explained this in the office.

[Defense Counsel]:

Q. Excuse me, Doctor. I'm just going to put this exhibit up.

[Doctor Raeuchele]:

The broad ligament, the two egg-shaped things there are the ovaries and that band of tissue that runs out on either side. That's the broad ligament. Can you see that? There's the pyramid. Now, it's very, very common for these fimbria to fall in here, and they are generally not stretched out like that and lay against this broad ligament. This is one broad ligament. Here's the other broad ligament. I try to stay away from that. And this could be stuck here.

Now, we can take the instrument and just peel that away like that very often, and then that allows these to be loose and open and functional again.

Now, I explained this to Vicki and said, do you want me to do this if we find it? I have no idea what we're going to find, but if we do, do you want me to do it? And she said, well, of course. Anybody would say, well, I'm there, that's what I'm here for. But I told her that if we peel this away and there is some bleeding here, we would have to stop it. All we do is take an instrument and insert it in here and just set it and that will seal the vessels off and stop the bleeding.

While we are doing this, suppose a spark would drop off and hit the bowel that's lying down here, put an opening in the bowel. Then we would have to—then we would tell her that we would have to repair that. So that is a reason for opening her abdomen. We couldn't send her back to bed and say, hey, you are bleeding in there. Is it all right to get permission to go back in and open your abdomen. And I went through this with Vicki in the office. And that would be one reason we would have to open your abdomen without your knowing it, because we'd have to stop the bleeding.

Second would be if there was a bowel burn and there was an opening in the bowel, we would have to go in and close that opening up.

The third reason is to open the abdomen without her knowing would be when we are putting the instruments in or if we tore—or we touched the ovary here and that got to bleeding or the bowel was lying up here and we put the instrument in and then we started the bowel and start some bleeding in the vessel here or anything else when we were inserting the instrument, we would have to open her abdomen without her knowing it.

And this was all discussed with Vicki before the—before the permission slip was signed. And naturally, she said, well, if this—if that's the way it is and if you can find something like that you can repair, I want you to go ahead and do it. I said, all right. As long as you understand that you may have to have an incision.

Q. Doctor, what is a Rubin and retrograde x-ray?

A. Well, during her history—I forgot to mention that. I should have followed my notes here.

I told her that there were other ways of finding out whether her tubes were open. One would be to inject air into the cervix, the mouth of the womb down there, and the air would go out through the tubes and be expelled into her abdomen. And she would know and we would know that the tubes are open if the air got out into the abdomen. And that's sort of a painful test because when the air goes out into the abdomen, it causes discomfort and she gets pain up here in her shoulders and so forth. That's probably the least desirable test, and it's painful.

The other is to inject x-ray material in the cervix down there in here, and the dye goes out through the tubes and comes off—and you can see the dye out here. And the effect—that's called the hysterosalpingogram.

We told her that she has two tests could be performed, but they are not as accurate as the laparoscopic procedure because with the laparoscope, when you are looking in there and you inject dye just like you do the x-ray

material, the dye comes out through the tubes and rolls off the fimbrial end. You can see the blue dye here and over here. And if that happens, you knew the tubes are open. It's a hundred percent puncture proof, plus the fact that when you are doing this procedure, and we call it a tubal patency test, when you are doing this, you have the advantage of being there with other instruments to correct any situation that might be present that was causing the tubes to be blocked off.

I told her if the tubes are blocked—and I want to reiterate this again—do you want me to try to open them if it's logical? She said, yes, naturally. That's why she's here, to see if she can get pregnant and to do any minor surgery or even major surgery, if you please, with the laparoscope. And I have been trained in that, and she accepted that description and signed the paper.

Q. And when you say she signed the paper, you are referring to Defendant's Exhibit No. 1, is that correct? And I'll show that to you if I can find it.

I place in front of you Defendant's Exhibit No. 1. A. Yes, that is the operative permit that she signed. [N.T. 267–276]

The lengthy consent form executed by the appellant at the conclusion of the discussion with appellee contained, on the reverse side, the following paragraph, typed while appellant waited, and read by her prior to signing the consent form:

Examination of the abdomen with a telescopic instrument *with the treatment of any condition with the ovaries, tubes or other tissue that might be deemed necessary, including fulgeration* (burning of tissue) *at this time.* I understand that in an emergency, such as bleeding or a bowel burn or puncture my abdomen may have to be opened. [emphasis supplied].

Injection of a dye through the tubes to determine if the tubes are open.

Appellee also presented the expert testimony of a gynecologist, Dr. Clifford R. Wheeless, who testified that drainage of the right hydrosalpinx was consistent with the

"standard of care known throughout the United States and the world for managing a clubbed fallopian tube.... The second thing they do [procedures for draining hydrosalpinx] though, they provide drainage of the hydrosalpinx and reduce the chance of recurrent pelvic inflammatory disease and reduce the chance of the dreaded and deadly tubal ovarian abscess, which still is a very high killer of women with tubal infections. Every year someone at the Johns-Hopkins dies of a tubal ovarian abscess. So the drainage of those are a very important part of the health care of women."

[N.T. 368].

Dr. Wheeless further testified that the cuffed tuboplasty procedure performed by the appellee was medically indicated due to the danger of future infection:

Q. Doctor, following that repair of the ovarian artery then Dr. Raeuchele went on to perform additional surgery on the right tube.

Do you have an opinion that you hold to a reasonable degree of medical certainty as to whether or not his conduct at that point in time was consistent with the standard of medical care?

A. Yes. I have an opinion.

Q. What is that opinion?

A. The opinion was the best attempt at fixing a diseased tube—this woman by this time had—her chances of pregnancy were small, quite crystal clear. By having the abdomen open, better exposure to the tube, he could make the hole in the tube, he could make the hole in the tube, the opening, the salpingostomy larger.

He could also have the opportunity to take back with fine sutures in a cuffed technique the opening like a morning glory flower to keep that tube open to give her the best chance she had of obtaining a pregnancy. But the more important thing than obtaining the pregnancy

was to prevent further infection that I've already mentioned can be life-threatening in these women. [N.T. 370–371].

Dr. Wheeless, in addition, further testified that microsurgery had the exact same success rate as the type of procedure performed by appellee upon appellant.

This Court, in *Sauro v. Shea*, 257 Pa.Super. 87, 94–95, 390 A.2d 259, 263 (1978), noted that

"Pennsylvania case law explicitly holds that the issue of informed consent is a question for the finder of fact.... Accordingly, the jury as fact-finder must evaluate the severity of the condition resulting from surgery, whether the result was a meaningful or only slight possibility of the surgical procedure, and whether a reasonable person would have considered the possibility of the resulting condition material to the decision to undergo treatment. Moreover, the jury must consider whether the physician adequately informed the patient of the nature and possible consequences of the procedure, as well as its alternative, and whether, under all the circumstances, the description was adequate to inform a reasonable person and render the consent valid."

*Accord: Jozsa v. Hottenstein*, 364 Pa.Super. 469, 473, 528 A.2d 606, 607–608 (1987).

The learned trial court, noting that appellee had not informed appellant, prior to the procedure, of the alternative of "microsurgery, of the comparative risks to fertility, or that she should attempt to have a child immediately after the surgery", nevertheless rejected the motion for judgment n.o.v., reasoning as follows:

Dr. Raeuchele explained that diseased fallopian tubes have a propensity to close over time and therefore, even though Vicki's right tube was devoid of viable fimbria, there is still a slight chance that an egg would pass through the tube and ultimately become fertilized. He thus encouraged her to attempt a pregnancy immediately after the surgery, before the tube could close. Defendant, in effect, created a window of time in which Vicki

had an increased chance of becoming pregnant; but for which she was admittedly unprepared, as she was not even married.

Notwithstanding this failure to inform, materiality is an objective question for the jury, based on all of the surrounding facts and circumstances. Plaintiff's argument that she should have been informed of microsurgery overlooks Defendant's testimony that there were no viable fimbria on her right tube. Though this was not discovered until after the operation began, both the Defendant and Dr. Wheeless testified that microsurgery would not have been more successful. Even Plaintiff's expert testified that without the fimbria, there is almost no chance of pregnancy. Plaintiff complains that this analysis frames the issue in negligence terms, but it must be remembered that the same evidence which negates negligence also bears directly on whether microsurgery was a material alternative. The testimony of Dr. Raeuchele and his expert discounted microsurgery and the jury agreed.

Plaintiff's importance of timing argument must fail for essentially the same reason.[1] We are bound to accept the Defendant's testimony that the right tube was devoid of fimbria. For that reason, microsurgery was not a viable alternative, regardless of when it would be performed. Secondly, should the tube close, there is nothing to prevent further surgery to open it. Finally, Dr. Raeuchele did testify that he told Vicki surgery may be required and that she consented. Although there was no emergency, he stated that a cuffed tuboplasty was necessary to prevent a recurrence of hydrosalpinx, which according to Dr. Wheeless can be fatal.

We are mindful that the law of informed consent "does not mandate that a risk is material only if its disclosure

1. It should be noted that appellant testified that she had engaged in sexual relations with her fiancee for a number of years without any form of birth control and in fact, due to the information provided by her, appellee suspected that she was pregnant on the day before her surgery was scheduled. As a result, appellee ordered certain tests to rule out pregnancy prior to performing the laparoscopy.

would result in the patient's decision to refuse medical treatment." *Sagala, supra* at 580, 533 A.2d at 168. Competent adults *do* have the right to be well informed prior to surgery and that it is *their* choice, whether it be rationale or irrational. *Id.* Full disclosure preserves the highest level of bodily autonomy. But the Court cannot overlook the defense testimony that microsurgery was not a viable alternative. The jury was charged that "A physician is bound to disclose only those risks which a reasonable person would consider material to her decision whether or not to undergo the treatment." By its verdict, the jury obviously decided it was immaterial. We are not in a position to substitute our judgment for that of the jury.

Since, in my view, there was sufficient competent evidence to support the verdict of the jury, I would affirm the judgment entered upon that verdict.